UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Civil Action No. 1:23-cv-8962 |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| v. | |
| STEPHEN EHRLICH, | |
| Defendant. | **JURY TRIAL DEMANDED** |

## I.     INTRODUCTION

1.      From at least February 28, 2022 through at least July 5, 2022 (the "Relevant Period"), Voyager Digital Ltd. ("Voyager Ltd."), Voyager Digital Holdings, Inc. ("Voyager Holdings"), and Voyager Digital, LLC ("Voyager LLC") (collectively, with any predecessor companies, acting as the common enterprise "Voyager"), along with Voyager Chief Executive Officer Stephen Ehrlich ("Ehrlich"), fraudulently solicited participation in and operated a digital asset trading and custody platform (the "Voyager Platform") in a manner that resulted in Voyager's bankruptcy, owing its U.S. customers over $1.7 billion.

2.      From mid-2018 and continuing through the Relevant Period, Voyager marketed and operated the Voyager Platform, which allowed customers in the United States to purchase, sell, trade, and store various digital asset commodities on the Voyager Platform.

3.      In an effort to win potential customers' business, Ehrlich and Voyager (by and through Ehrlich and other employees and agents) portrayed Voyager as a safe and trustworthy custodian of customers' digital assets.  On Voyager's website (www.investvoyager.com), in press releases, and elsewhere, Ehrlich and Voyager represented to potential customers that the Voyager Platform would serve as a "safe haven" for their digital assets in an otherwise volatile

market environment and that Voyager would operate with the "same level of rigor and trust" as traditional financial institutions.  These promises of safety and responsibility were central to Voyager's marketing of its platform.

4.      Voyager also promised customers a high-yield return on certain stored digital asset commodities.  Since approximately October 2019, Voyager operated a program (the "Rewards Program"), which promised customers who held certain digital assets on the Voyager Platform a return (or "reward") as high as 12%.  Voyager emphasized that its rewards rates were "a significant premium to traditional savings accounts, especially with interest rates near zero," and represented that the Voyager Platform offered a straightforward mechanism to keep customer assets safe while also maximizing the assets' value.  Throughout the operation of the Rewards Program, Ehrlich and Voyager promised customers that assets would be treated safely and responsibly.

5.      Based on Ehrlich and Voyager's promises of high-yield returns and responsible safekeeping, the Voyager Platform facilitated the sale, purchase, and storing of billions of dollars' worth of digital asset commodities.  During the Relevant Period, the value of the digital asset commodities customers stored on the Voyager Platform often exceeded $2 billion.  During the same time, Ehrlich and Voyager engaged in a pattern of making misleading and false statements to induce customers to store and not withdraw their digital asset commodities from the Voyager Platform.  Behind the scenes, at Ehrlich's direction and approval, Voyager took excessive risks with customer assets.  Voyager pooled customer assets stored on the Voyager Platform and conveyed billions of dollars' worth of pooled customer Bitcoin ("BTC"), USD Coin ("USDC"), and other digital asset commodities to high-risk third parties in exchange for returns to fund the Rewards Program.  In some cases, Voyager made unsecured transfers in

sufficient volume to bankrupt Voyager in the event of non-repayment. As part of this practice, undisclosed to its customers, Voyager conveyed pooled customer assets to counterparties at high risk of default, including Firm A (now bankrupt), Firm B (the now-bankrupt trading arm of a now-bankrupt digital asset trading platform), Firm C (now bankrupt), and Firm D (now bankrupt). Voyager inaccurately determined each counterparty was low risk. Voyager personnel lacked sufficient experience assessing counterparty risk and conducted grossly insufficient due diligence on its counterparties.

6.      Voyager's reckless transfers led to its own demise. In early 2022, Voyager (with Ehrlich's direction and approval) transferred over $300 million in customer BTC and $350 million in customer USDC to Firm A (a digital assets hedge fund). Voyager personnel believed a relationship with Firm A would be "huge" for Voyager's business—despite that Firm A cautioned in a prominent disclaimer before entering its website that there was a "high degree of risk involved" in investing with Firm A and that investors should be prepared to potentially lose "all the money" invested with Firm A. Firm A's website further described that Firm A participated in various high-risk, volatile digital asset markets.

7.      Prior to conveying pooled customer assets to Firm A, Voyager provided Firm A a short due diligence questionnaire ("DDQ") requesting audited financial statements and asking several additional questions regarding Firm A's business. However, Firm A refused to provide *any* financial statements (much less audited ones) in response to Voyager's request. Instead, Firm A sent Voyager a one-sentence letter titled "AUM Letter" ("AUM" refers to "assets under management") purporting to list Firm A's net asset value, with no supporting documentation. Firm A eventually sent short (typically several-word) responses to various DDQ questions. Nevertheless, Ehrlich and Voyager's Loan Risk Committee (which Ehrlich chaired) approved

hundreds of millions of dollars' worth of "loans" of pooled customer assets to Firm A. Ultimately, Firm A itself went bankrupt due to the failure of its high-risk trading strategies, including trading on derivatives trading platforms, and defaulted on its obligations to Voyager, failing to repay any of the digital asset commodities transferred to it.

8.      Ehrlich and Voyager embarked on an intentional effort to conceal from its customers its exposure to Firm A and its own precarious financial position.  On June 12, 2022, Voyager's official Twitter account tweeted (and Ehrlich retweeted) the misleading assertion that "[a]ll Voyager products and services are fully operational and remain unaffected by current market conditions."  The next day, Voyager recalled some pooled customer assets from Firm A. Voyager recalled all of its remaining pooled customer assets from Firm A on the morning of June 14.  That same day, Voyager issued a press release omitting any mention of Firm A; falsely stating that it was "not involved" in the various speculative crypto investments in which Firm A participated; and quoting Ehrlich, who falsely stated that Voyager was "in a good position to weather this market cycle and protect customer assets."

9.      The same day, Ehrlich tweeted from his personal Twitter account an article headlined "EXCLUSIVE:  Voyager Digital CEO Says 'Customer Assets Are Safe' Amid Crypto Collapse."  The article quoted Ehrlich as stating, "Our financials are public.  You can see everything about us."  Ehrlich's representation was false.  Voyager's relationship with Firm A was not confirmable in Voyager's public financials.  Voyager's public financials described Firm A only by geographic location:  "Singapore."  Voyager's public financials also misstated Voyager's active exposure to Firm A; public financials indicated the Singapore counterparty held $326 million in Voyager customer digital assets.  Voyager's true exposure at the time was over $685 million.

10.     Over the next month, Voyager, at Ehrlich's direction, continued to omit key details regarding its exposure to Firm A and its going-forward ability to operate and honor customer withdrawals.  When Canadian securities regulators (with whom Voyager communicated given Voyager Digital Ltd.'s public listing on the Toronto Stock Exchange) repeatedly inquired how Voyager could justify not sharing more detailed financial information with the public in light of its exposure to Firm A, Voyager explained that if customers possessed accurate information regarding Voyager's exposure to Firm A and its own deteriorating financial condition, customers would likely withdraw their assets from the Voyager Platform, resulting in Voyager's failure.

11.     Internally, Voyager scrambled to recoup pooled customer assets from other counterparties to meet its obligations to its customers while also encouraging and monitoring the flow of new digital asset purchases and transfers by its customers on the Voyager Platform. Voyager was deeply concerned that the pace of customer withdrawals would exceed the amount of deposits and funds available to it.  Voyager's mad dash to fatten the Voyager Platform while concealing its actual financial condition was, by this stage, indistinguishable from a Ponzi scheme.

12.     Ultimately, as a result of the Firm A default, Voyager went bankrupt.

13.     Voyager operated a commodity pool ("Voyager Pool").  Voyager pooled assets purchased by Voyager customers, and Voyager did so for the purpose of lending digital assets to third parties to trade, among other things, commodity interests for the benefit of Voyager's customers ("pool participants") and acted as an unregistered commodity pool operator ("CPO") of the Voyager Pool by soliciting, accepting, or receiving assets for the purpose of trading commodity interests.

14.     Ehrlich operated as an unregistered associated person ("AP") of Voyager (an unregistered CPO), by soliciting members of the public to participate in the Voyager Pool.

15.     Through this conduct, Ehrlich and Voyager, by and through Ehrlich and other employees and agents, engaged, is engaging, or is about to engage in fraudulent and additional acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2022), specifically Sections 4k(2), 4m(1), 4*o*(1)(A)–(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6*o*(1)(A)–(B), 9(1), and Regulations 4.21(a)(1) and 180.1(a)(1)–(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)–(3) (2022).  In addition, Ehrlich, as a controlling person of Voyager who did not act in good faith or knowingly induced the violations, is liable for each of Voyager's violations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

16.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin such acts and practices and compel compliance with the Act. In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

17.     Unless restrained and enjoined by this Court, Defendant is likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.     JURISDICTION AND VENUE

18.     **Jurisdiction**.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue

by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the

Commission to seek injunctive and other relief against any person whenever it appears to the

Commission that such person has engaged, is engaging, or is about to engage in any act or

practice constituting a violation of any provision of the Act or any rule, regulation, or order

thereunder.

19.    **Venue**.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act,

7 U.S.C. § 13a-1(e), because Defendant is found in, inhabits, or transacts business in this

District, and because acts and practices in violation of the Act occurred, are occurring, or are

about to occur, within this District.

### III.    THE PARTIES AND ADDITIONAL RELEVANT ENTITIES

#### A.    The Parties

20.    Plaintiff **Commodity Futures Trading Commission** ("Commission" or

"CFTC") is an independent federal regulatory agency that is charged by Congress with the

administration and enforcement of the Act and Regulations.  The Commission maintains its

principal office at Three Lafayette Centre, 1155 21st Street, N.W. Washington, D.C. 20581.

21.    Defendant **Stephen Ehrlich**, a resident of Tennessee, is the co-founder and

former Chief Executive Officer of Voyager Digital Ltd., Voyager Digital Holdings, Inc., and

Voyager Digital, LLC, positions he held since at least mid-2018 and continuing through the

Relevant Period.  As Chief Executive Officer, Ehrlich controlled each of the Voyager entities.

Ehrlich has never been registered with the Commission.

#### B.    The Voyager Entities

22.    **Voyager Digital Ltd.** is a Canadian corporation with its principal place of

business in New York.  Voyager Ltd. is a public company which traded on the Toronto Stock

Exchange ("TSX") under the stock ticker VOYG until approximately July 7, 2022, when TSX

notified Voyager Ltd. that TSX would review the eligibility of Voyager Ltd.'s common shares

for continued listing on the TSX as a result of Voyager Ltd.'s bankruptcy filing, and

Voyager Ltd. notified the TSX that it was voluntarily delisting its common shares on the TSX.

On July 15, 2022, Voyager Ltd. announced that its common shares had resumed trading on the

OTC Pink Sheets under the new ticker symbol "VYGVQ."  Voyager Ltd. (along with Voyager

Holdings and Voyager LLC) filed for bankruptcy in July 2022 in connection with the conduct

described herein.  *See In re Voyager Digital Holdings, Inc.*, No. 22-10943-mew (Bankr.

S.D.N.Y. filed July 5, 2022) (Jointly Administered) (the "Bankruptcy Case").  The Bankruptcy

Court in the Bankruptcy Case has confirmed an amended bankruptcy plan providing for each

Voyager entity's liquidation and has approved Voyager's liquidation procedures.  *See id.*,

ECF Nos. 1166, 1398.  Voyager Ltd. has never been registered with the Commission.

23.     **Voyager Digital Holdings, Inc.** is a Delaware corporation with its principal place

of business in New York.  Voyager Holdings is a wholly owned subsidiary of Voyager Ltd.

As set forth above, Voyager Holdings filed for bankruptcy in July 2022 in connection with the

conduct described herein.  Voyager Holdings has never been registered with the Commission.

24.     **Voyager Digital, LLC** is a Delaware limited liability company with its principal

place of business in New York.  Voyager LLC is a wholly owned subsidiary of

Voyager Holdings.  As set forth above, Voyager LLC filed for bankruptcy in July 2022 in

connection with the conduct described herein.  Voyager LLC has never been registered with the

Commission.

## IV.     FACTS

### A.     Overview of Digital Assets

25.     A digital asset is anything that can be stored and transmitted electronically and

has associated ownership or use rights.  Digital assets include virtual currencies, such as BTC

and USDC, which are digital representations of value that function as mediums of exchange, units of account, and/or stores of value.

26.     Certain digital assets are "commodities", including BTC, USDC, and others, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

27.     Commodity options are "swaps" as defined under Section 1a(47) of the Act, 7 U.S.C. § 1a(47).

**B.     Overview of Voyager's Business and Rewards Program**

28.     Starting in mid-2018 and continuing through the Relevant Period, Voyager marketed and operated the Voyager Platform, which allowed customers across the United States to purchase, sell, trade, and store various digital asset commodities on the Voyager Platform. During the Relevant Period, Voyager policy allowed only United States residents to utilize the Voyager Platform.

29.     Starting in mid-2018 and continuing through the Relevant Period, Voyager U.S. customers funded accounts on the Voyager Platform with U.S. dollars ("USD") or various digital asset commodities.  During the Relevant Period, customer USD on the Voyager Platform was held in omnibus bank accounts located at an FDIC-insured bank in this District.

30.     When a Voyager U.S. customer purchased a digital asset commodity on the Voyager Platform, Voyager, through its order management system, instructed the bank to move USD from an account to a third-party trading platform or market-maker.  Some such third-party trading platforms and market-makers were located in the United States, and certain market-makers were located in this District.  Voyager then received the digital asset commodity from the third-party trading platform or market-maker, which was reflected in the U.S. customer's account on the Voyager Platform.

31.     Voyager initially held such digital asset commodities through one of its approved
cryptocurrency custodians.  Voyager utilized third-party custodians or self-custody solutions to
custody digital asset commodities.  Some such third-party custodians were located in the United
States, including in this District.

32.     U.S. customer sales of digital asset commodities on the Voyager Platform
occurred in a similar manner and resulted in customers being credited USD held in one or more
omnibus bank accounts located at the same FDIC-insured bank in this District.  The Voyager
Platform did not permit U.S. customers to directly trade one digital asset commodity for another.

33.     By storing digital asset commodities on the Voyager Platform, Voyager's
customers could earn rewards on those digital asset commodities.  For example, in
approximately March 2022, customers could store USDC on the Voyager Platform and earn a
9% reward.

34.     Voyager generated revenue, including to pay rewards to customers, in two
principal ways.  First, Voyager earned revenue by charging customers fees in connection with
their digital asset transactions on the Voyager Platform.  Second, Voyager pooled the digital
asset commodities that its customers purchased or stored and transferred certain of those pooled
assets to third parties such as Firms A, B, C, and D, and charged those counterparties interest on
the putative "loans."  For example, on approximately March 15, 2022, Voyager transferred
100 million USDC consisting of pooled customer assets to Firm A, requiring a 9% return.
Around this time, as noted above, Voyager would pay a 9% reward to customers who stored
USDC on the Voyager Platform.

**C.**      **Ehrlich's and Voyager's Representations to Potential Customers Promising Safe and Responsible Treatment of Customers' Digital Assets**

35.      Starting in mid-2018 and continuing through the Relevant Period, in an effort to convince members of the public to purchase or store their digital assets on the Voyager Platform, Ehrlich and Voyager repeatedly emphasized the safety and security of the Voyager Platform and promised prospective customers it would treat those assets safely and responsibly. These assurances were authorized and/or made by Ehrlich and Voyager from the United States.

36.      At least as far back as June 2018—when Voyager was preparing to launch the Voyager Platform—Voyager promised on its website that the Voyager Platform would be a "safe," "trusted," and "secure" repository for customer digital assets.

37.      In approximately November 2019, Ehrlich co-wrote a publicly available white paper promising an "easy, safe, and convenient" digital asset trading experience with a goal of making "crypto markets accessible, open, safe, and fair for everyone." The white paper further stated that the Voyager Platform "lets you custody your way with funds that are always secure and liquid ensuring that your funds are safe and available when you need them;" and that "Voyager aims to be the safest and most consumer-oriented place to transfer, custody and trade crypto." Voyager further represented that the public should trust Voyager to act responsibly with customer assets because Voyager was a publicly traded company. Voyager emphasized that it would "operate with the same level of rigor and trust that financial institutions afford. We take your money very seriously. You can expect only the highest quality products and services with around the clock support. This is how financial services should be." Based on these promises, the white paper encouraged the public to "[t]ry out our product . . . and see for yourself what all the excitement is about."

38.     In the same November 2019 white paper, Ehrlich emphasized the Rewards Program as a differentiating factor distinguishing Voyager from most other players in the digital asset space.  Voyager and Ehrlich enticed customers to purchase and custody digital assets on the Voyager Platform—"Voyager is one of the only brokers that offers interest bearing accounts with no lockups alongside a competitive trading offering."

39.     On approximately December 18, 2019, Voyager falsely stated on its blog that customer USD held with Voyager was insured by the FDIC up to $250,000 in the event of *Voyager's* failure, not just the failure of the bank where Voyager held customer USD.  Voyager wrote, "Through our strategic relationships with our banking partners, all customers' USD held with Voyager is now FDIC insured.  That means that in the rare event your USD funds are compromised due to the company or our banking partner's failure, you are guaranteed a full reimbursement (up to $250,000)."  In reality, FDIC insurance would not protect customer USD in the event of Voyager's failure.

40.     In an approximately May 6, 2020 press release, Voyager reiterated to the public that their assets would be safe on the Voyager Platform.  For example, in announcing the addition of five interest-bearing assets to Voyager's Rewards Program, Voyager wrote, "The addition of these five new assets brings the total number of interest-bearing assets offered through Voyager's Crypto [Rewards] Program to 14 at a time when investors are looking for safe haven alternatives to traditional equity markets.  Voyager's Crypto [Rewards] Program offers interest rates up to six percent, a significant premium to traditional savings accounts, especially with interest rates near zero."  The press release quoted Ehrlich, who stated, "As people continue to turn to digital assets, particularly stablecoins, for safe havens in this time of uncertainty, we want to do whatever we can to protect their assets while maximizing value."

41.     Likewise, in an approximately October 27, 2020 press release, Voyager reiterated that its Rewards Program "is to provide our customers with a safe haven to hedge their assets during this time of uncertainty in today's economic climate."

42.     Certain terminology Voyager prominently deployed when describing its Rewards Program gave the impression that customers could participate in the Rewards Program without having their assets conveyed out *at all*, despite Voyager's fine-print descriptions of how Voyager could in fact dispose of the assets.  For example, on Voyager's website as of December 2021, Voyager advertised that "you can earn 12% annual rewards on Voyager by holding assets like Polkadot (DOT) in the app."  While, in fact, customers could earn those rewards only by participating in the Rewards Program—which involved Voyager lending certain of those assets to third parties—phrases such as "earn . . . rewards . . . by holding assets . . . in the app" implied that interest could be earned without those assets ever leaving the Voyager Platform.  This ambiguous doublespeak contributed to the overall message that customer assets would be safe and treated responsibly on the Voyager Platform.

43.     In contrast to Voyager's splashy and repeated public assurances regarding safety, trustworthiness, and responsible treatment of customer assets when marketing the Voyager Platform on its website and in press releases, Voyager provided customers boilerplate risk disclosures regarding its business, including its disposition of pooled customer assets on the Voyager Platform, in small-font "terms and conditions" and in various iterations of its lengthy, single-spaced user agreement.  For example, in Voyager's approximately August 2021 version of its user agreement—which was 30 pages long and over 17,000 words of single-spaced text— Voyager reserved the right to "pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer" customer digital assets and to use or invest those assets at the customer's own

risk, including the risk of losing all of a customer's cryptocurrency and that loans to third parties could be unsecured and uncollateralized; and to stake customer digital assets or make unsecured loans of customer digital assets to institutional third parties "determined at Voyager's sole discretion."

44.     Given the prominently featured messages of safety and security designed to attract customers to the Voyager Platform, these disclosures in Voyager's user agreement did not disclose, and would not have made a reasonable Voyager customer aware, that Voyager planned to recklessly lend out their assets to counterparties that engaged in high-risk trading in commodity interests and other risky investments like Firm A (which prominently cautioned on its own website that it engaged in high-risk trading and that investors should be prepared to lose all of their money) without conducting any meaningful diligence and in a volume sufficient to bankrupt Voyager in the event of non-repayment.  To the contrary, Voyager's representations had sent the overall message that any treatment of customer assets would be done safely, responsibly, and with the rigor customers had come to expect from traditional financial institutions.  Voyager did not do so.

45.     Voyager never disclosed to customers the steps it would take to diligence prospective counterparties and assess repayment risk prior to transferring pooled customer assets. Based on Ehrlich's and Voyager's public representations described above, Voyager should have conducted due diligence and conveyed customer assets responsibly and consistently with the promise to keep customer assets safe and secure, with the rigor of a traditional financial institution.

**D.      Ehrlich's and Voyager's Undisclosed Reckless Treatment of Customers' Digital Assets**

46.      Voyager transferred large volumes of pooled customer assets to multiple high-risk third parties (including Firms A–D), without conducting sufficient diligence.  In some instances, Voyager got lucky—for example, Firms B, C, and D and certain others repaid Voyager.

47.      With respect to Firm A, Voyager was similarly reckless but, unfortunately for Voyager's customers, far less lucky.  Voyager transferred Firm A over $650 million worth of digital assets commodities—an amount sufficient to bankrupt Voyager in the event of non-repayment—without conducting any meaningful diligence, and without obtaining even the minimal materials (such as audited financials) requested in its bare-bones DDQ.

48.      In or around February 2022, Voyager began discussing with Firm A a potential "loan" of significant assets to Firm A.  However, instead of proceeding cautiously as a responsible steward of its customers' assets, Voyager at the time focused more on the profit potential of the relationship and doing whatever was needed to clear *Firm A's* onboarding process and diligence *of Voyager*.  For example, on approximately February 7, 2022, a Voyager senior executive ("Executive 1") communicated with Firm A regarding Firm A's efforts to onboard Voyager for lending to Firm A and/or affiliates Firm A controlled.  A second Voyager senior executive ("Executive 2") forwarded that email to relevant Voyager personnel, writing "this one could be huge for us.  Is it possible to make this a high priority item?"

49.      That same day, Executive 2 communicated with Ehrlich regarding the prospective Firm A relationship, noting that he and Executive 1 would update Ehrlich that night and that Firm A "may be a massive borrower for us."  Ehrlich responded, "Awesome.  Nice job."  Ehrlich also expressed dissatisfaction that the Loan Risk Committee "has 2 lawyers" and expressed the need "to rethink risk committee.  Shouldn't be dominated by legal."

50.     The reason that Voyager personnel believed that "massive" transfers to Firm A had the potential to "be huge" for Voyager is that Voyager needed significant revenue to help fund its Rewards Program and to be able to pay the promised return to customers for storing their assets on the Voyager Platform.  Voyager believed it could earn the critically needed high-percentage returns by conveying pooled customer assets to third parties.

51.     On approximately February 11, 2022, Voyager and Firm A executed a Non-Disclosure Agreement and began negotiating a Master Loan Agreement.

52.     However, on approximately February 16, 2022, Firm A emailed Executive 1, Executive 2, and others, noting that Voyager would need to remove the requirement in the draft Master Loan Agreement to provide audited financial statements:  "[A]s communicated we don't send financials to lenders . . . ."  Executive 2 forwarded that email internally at Voyager, asking "Let us know what you think of the attached statements.  They are providing us with a [net asset valuation" ("NAV")] statement in place of audited financials."

53.     An "NAV statement" was not a responsible replacement for audited financials. Instead of dozens or hundreds of pages of financial information audited by a certified public accountant, a Firm A cofounder provided a letter titled "AUM Letter" containing the following single sentence with zero supporting documentation:

> To Whom It May Concern,
>
> We confirm the following for [Firm A] as at 1-January-2022 in millions of USD.
>
> **NAV 3,729**

54.     On February 16, 2022, the same day that Firm A responded to Voyager's request for audited financial statements with a one-sentence letter, Firm A emailed Executive 2 and others noting that Firm A needed additional documents *from Voyager* to complete *Firm A's*

onboarding process.  Executive 2 forwarded to the Voyager employee who was compiling onboarding documents as well as Ehrlich, asking the Voyager employee "Can you please help get this over the line ASAP?  This is a high priority for us as they are going to be a huge borrower.  Copying Steve [Ehrlich] for awareness and to let him know if you need any of his documents directly from him."

55.     On February 17, 2022, a relevant Voyager employee asked Executive 2, 'How does finance feel about NAV statements instead of financials?"  Executive 2 replied, "It's something we should discuss."  Over the next week and a half, various Voyager personnel discussed whether to accept unsubstantiated, one-sentence "NAV statements" alone instead of audited financials.

56.     At the same time these discussions were occurring, Voyager was discussing the need to lend assets "to riskier borrowers" to accomplish its business goals, including generating high returns with customers' pooled assets.  For example, on approximately February 23, 2022, Executive 2 communicated with Executive 1, writing "[W]hen you get a chance can you get back to us on the [Firm B] question . . . .  Trying to talk Steve [Ehrlich] into taking BTC down to 4%."  Executive 1 asked, "Is he pushing back?"  Executive 2 wrote, "I think he gets there."  Executive 1 responded, "I think it boils down to if we want to have that rate on btc, we'd have to be open to other strategies beyond basic lending[,] **or we have to beef up the team and onboard/lend to riskier borrowers**" (emphasis added).

57.     During this period, Voyager's counterparty diligence process was broken, reflecting an inability or unwillingness to accurately assess counterparty risk.  For example, on approximately January 28, 2022, Voyager completed limited diligence on Firm C, concluding it was "low risk."  Firm C later went bankrupt.  Similarly, on approximately February 22, 2022,

Voyager completed limited diligence on Firm B, concluding it was "low risk."  On June 13, 2022, while still officially concluding Firm B was low risk, Ehrlich privately confided to a professional athlete, "My biggest fear is that [Firm B] is a house of cards.  Not for us but will blow up the industry[.]"  Firm B later went bankrupt.  Similarly, in connection with a prospective business relationship with Firm D, Voyager evaluated Firm D as a "low risk" counterparty. Firm D also went bankrupt in 2022.

58.     During the Firm A diligence process, Voyager personnel did not receive Firm A income statements, cash flow statements, balance sheets, or even a debt-to-asset ratio.  Voyager did not conduct any stress testing of Firm A's liquidity.  Numerous individuals involved in the diligence process did not have a background in credit risk evaluation.

59.     Firm A's website during this period listed numerous high-risk investments. A prominent disclaimer that popped up prior to entering Firm A's website stated, among other things, that "[b]ecause of the risks involved, investment in a [Firm A] fund is only suitable for sophisticated investors who can bear the loss of a substantial portion or even all the money the [sic] invest in the Fund without altering their standard of living, who understand the high degree of risk involved, believe that the investment is suitable based upon their investment objectives and financial needs and have no need for liquidity of investments."  Prior to Voyager establishing a counterparty relationship with Firm A,  Executive 1 and certain other Loan Risk Committee members visited the Firm A website and discussed the breadth of the investments listed.

60.     During a call just after midnight U.S. time on March 1, 2022, between a Firm A co-founder and numerous Voyager personnel, Executive 2 privately communicated to Executive 1 that consummating a lending relationship with Firm A was important because

Firm A would likely "be a liquidity provider for" Voyager down the road—that is, Firm A could effectively use Voyager's pooled customer assets to purchase Voyager stock.

61.     On March 1, 2022, Voyager's Finance and Treasury Department sent the Loan Risk Committee (headed by Ehrlich) a memo titled "[Firm A] – Borrower Initial Credit Risk Summary."  The memo described the "Assessment Procedure" as a call that morning with a Firm A co-founder.  The memo purports to describe Firm A's business, including that it participates in DeFi.  The memo repeated the unsubstantiated claim regarding Firm A's net asset value, and noted that "[d]etailed financials are not shared with counterparties . . . ."  The memo recommended pursuing a lending relationship, given the "Low Risk of Default."

62.     At that time, Voyager knew that Firm A pooled capital from outside investors and "lending" counterparties and used the pool capital to trade commodity interests.

63.     On March 1, 2022, the Loan Risk Committee (including Ehrlich, Executives 1 and 2, and others) met to discuss Firm A.  At that meeting, despite the almost non-existent due diligence conducted on Firm A, Ehrlich, as CEO and leader of the Loan Risk Committee, decided to go forward with the lending relationship with Firm A.

64.     On or around March 3 or 4, 2022—after Ehrlich and the Loan Risk Committee had approved the lending relationship with Firm A—Firm A provided Voyager a limited number of additional materials that did not provide a meaningful window into Firm A's financial health.  Those materials included a Certificate of Incorporation; a Certificate of Good Standing; an organizational chart; and Firm A's anti-money laundering procedure.

65.     With those materials, Firm A provided bare-bones responses to Voyager's two-page DDQ.  Firm A's responses provided an overview of Firm A's business operations,

financials, and products.  These responses described Firm A's strategy for trading in digital asset commodity interests.

66.     Voyager failed to investigate concerning representations in Firm A's diligence responses that an even minimally functioning diligence process would have investigated.  For example, Firm A identified itself to Voyager as the "master fund" in a "master-feeder hedge fund" structure.  Firm A indicated that assets Firm A received from Voyager would be "safeguarded within our fund without segregation" from the assets of different accounts or clients.  That is, Firm A would pool Voyager's transferred assets and provide Voyager Firm A's "yield-generating product."  Firm A further explained it planned to use Voyager's transferred assets to engage in spot-futures arbitrage trading (i.e., basis trading) to take advantage of contango in the market for digital assets.  Firm A's organizational chart reflected that Firm A had a "feeder fund" and external investors.  Voyager personnel responsible for reviewing these materials did not follow up on any of these representations.

67.     Voyager's willingness to make unsecured transfers of assets to Firm A sufficient to bankrupt Voyager in the event of non-repayment, following a completely inadequate diligence process, was inconsistent with Voyager's promises of safety and responsible treatment of customers' digital assets and its promise to operate with the "same level of rigor and trust . . . [as] financial institutions."

68.     On March 4, 2022, Voyager signed a Master Loan Agreement with Firm A. Ehrlich specifically approved entering into the Master Loan Agreement.  The Master Loan Agreement asserted that "Borrower has provided sufficient information to allow the Lenders to perform requisite 'Due Diligence,' with the Borrower successfully completing such Due Diligence."

20

69.     The Master Loan Agreement that Voyager signed also stated that Firm A had provided to Voyager "historical financial statements . . . audited by independent certified public accountants" and were complete and accurate.  Voyager knew this was false.  In reality, Firm A never provided any financial statements to Voyager.

70.     The Master Loan Agreement also provided that specific term sheets would govern future loans.

71.     On approximately March 7, 2022, Executive 1 wrote to Ehrlich and others "$100MM BTC and $100M USDC going to [Firm A] at 2% and 8% respectively."  Ehrlich responded, "thanks…approved."  Executive 1 then communicated that Firm A agreed to 9% on USDC.  These transfers of BTC and USDC included pooled Voyager customer assets.

72.     On approximately March 8, 2022, Voyager and Firm A signed two term sheets: one providing for Voyager's loan of 2,750 BTC to Firm A at 2% interest and one providing for Voyager's loan of 100 million USDC to Firm A at 9% interest.  Voyager did not require collateral from Firm A on either transfer.  Ehrlich approved each transfer to Firm A.

73.     On approximately March 15, 2022, Voyager and Firm A signed another term sheet providing for Voyager's transfer of another 100 million USDC to Firm A at 9% interest with no collateral required from Firm A.  Ehrlich approved the transfer to Firm A.

74.     On approximately March 25, 2022, Executive 2 summarized for Ehrlich a discussion with Firm A, noting, among other things, that Firm A "just signed a deal to borrow 10 figures in stable coins (i.e., billion) from a new lender."  Voyager did not thereafter discuss internally whether Firm A's apparent additional borrowing affected its financial health, alleged AUM/NAV, or ability to repay Voyager.

75.     On approximately March 30, 2022, a Firm A co-founder sent Voyager an additional one-sentence "AUM Letter" asserting, without supporting documents, that Firm A's NAV as of March 1, 2022, was 3,218 million of USD.  This amount was lower than the 3,729 million of USD reported as of January 1, 2022.  No one at Voyager asked Firm A what caused the purported reduction in NAV amounting to hundreds of millions of dollars in just two months.

76.     On approximately March 30, 2022, Voyager posted a "Community Update" to its website, noting that Voyager had discussed with various U.S. and state regulators potential regulatory issues with its Rewards Program.  The Community Update stated that **"[a]ll Voyager customer assets are accessible and will continue to be**" (emphasis added).

77.     Notably, also in March 2022, Ehrlich transferred approximately $1.1 million to his wife's revocable trust.  This transfer reflected the net proceeds Ehrlich received from a 2021 performance bonus paid in 2022.  Around the same time, Ehrlich transferred additional assets worth approximately $280,000 to his wife's revocable trust.

78.     On approximately April 1, 2022, Voyager and Firm A signed two additional term sheets:  one providing for Voyager's loan of 10,000 BTC to Firm A at 2% interest and one providing for Voyager's loan of 150 million USDC to Firm A at 8% interest.  Voyager did not require collateral from Firm A on either transfer.  Ehrlich approved each transfer to Firm A.

79.     On approximately May 5, 2022, Voyager and Firm A signed another term sheet providing for Voyager's loan of an additional 2,500 BTC to Firm A at 2% interest with no collateral required from Firm A.  Ehrlich approved the transfer to Firm A.

80.     On approximately May 6, 2022, Voyager was soliciting equity investments from various strategic partners.  On that date, Executive 2 communicated with Ehrlich that Voyager had solicited such an investment from Firm A, but was unsure if Firm A would ultimately invest.

Ehrlich replied, "We can hold them in our pocket.  [Another Voyager employee] has also pinged some of our early investors . . . We will get there quickly."  Ultimately, around May 20, 2022, Firm A did purchase approximately $2 million in Voyager shares.  On May 24, 2022, a Firm A co-founder tweeted that he was "Excited to co-invest in Voyager Digital . . . .", in response to which Ehrlich tweeted from his personal Twitter account, "Excited to have you on as an investor and partner!!"

81.     In early May 2022, key components of the popular Terra blockchain ecosystem began to collapse.  The terraUSD ("UST") algorithmic stablecoin (which was intended to remain stable and pegged to 1 USD, not to increase or decrease in value) de-pegged and began a severe death spiral in value, also implicating the value of its companion token LUNA (which, among other things, was used to stabilize UST's market price).  By May 9, UST's price fell to approximately 35 cents, and by the end of May 2022, UST's market price stabilized at approximately 2 cents.  LUNA's price fell from approximately $80 to a few cents by May 12, and by the end of May 2022, LUNA's market price was less than a cent.

82.     Firm A had previously indicated to Voyager that it had one or more significant equity investments in the Terra Luna ecosystem.  Firm A's website also indicated that it had one or more significant equity investments in the Terra Luna ecosystem.  Further, Firm A's significant participation in the Terra Luna ecosystem was publicly reported, including in news articles and on social media.  For example, a May 5, 2022 cointelegraph.com article publicized Firm A's alleged sale of $500 million worth of BTC to the Luna Foundation Guard [or "LFG," the entity that existed to support the UST peg, including by acquiring BTC to be deployed during periods of market volatility] in an apparent effort to help UST maintain its peg to the dollar.

83.     On approximately May 9, 2022, as it was becoming apparent that the Terra Luna ecosystem was collapsing, Voyager personnel discussed the potential collapse as well as their understanding that Firm A was a "big investor[]" in that ecosystem.  Specifically, a Voyager employee wrote to Executive 2 that "I think we need to pull back other BTC if he hasn't already. We're almost fully lent . . . . The way I see it, [Firm C] and [Firm A] are providing OTC trading (similar to block trades) for LFG because they have more expertise moving large positions without adversely impacting the market . . . . [Firm A] has a natural long BTC position so has the inventory to sell.  They either were in the process of reducing risk or were willing to help LFG given they are big investors.  There has been a lot of chatter on crypto twitter about UST being susceptible to a 'Soros style attack.'"

84.     Later on May 9, Executive 1 and Executive 2 asked Firm A, "Want to check in on the UST situation and see how everything is."

85.     Over the next several days, these individuals had multiple calls and meetings regarding Firm A's exposure to the Terra Luna ecosystem.  Voyager relied on unsubstantiated representations that Firm A had not lost much in the Terra Luna collapse.  Voyager did not attempt to substantiate those representations by requesting audited financials to assess the precise degree of Firm A's exposure to Terra or LUNA or conduct additional meaningful diligence on Firm A.

86.     During this time, Voyager was beginning to experience its own "operational liquidity" issues.  For example, on May 12, 2022, Executive 1 reached out to Firm A and indicated that Voyager was "looking to recall some USDC today as we need it for operational liquidity . . . ."  Firm A pushed back on this recall request and suggested that Firm A keep all the previously transferred USDC but increase the return to 10%.  On approximately May 12 and 13,

2022, Voyager agreed with Firm A's suggestion and secured an additional percentage point or two on its outstanding "loans" (3% instead of 2% on BTC, and 10% instead of 8–9% on USDC), rather than recall any assets from Firm A.

87.     Voyager's "operational liquidity" issues stemmed from the extraordinary volume of customer assets it pooled and conveyed to third parties, including to Firm A for the purpose of trading commodity interests.  At various times during 2022, entities including Firm A, Firm B, and Firm D each held over 25% of Voyager's total assets.  During the Relevant Period, Voyager's "loan" counterparties often collectively held over $2 billion of Voyager's assets.

88.     On approximately May 23, 2022, a Firm A co-founder provided another one-sentence "AUM Letter," which made the unsubstantiated representation that NAV had dwindled to 2,574 million of USD—a 31% drop, assuming the representations were accurate—"as at [sic] 23-May-2022."  In response, Voyager did not request audited financials, conduct other additional meaningful diligence, recall any customer assets from Firm A, or inquire how Firm A could now produce same-day NAV when previously Firm A had taken several weeks to produce a historical NAV.

89.     On approximately June 10, 2022, Executives 1 and 2 messaged Firm A that "we are hearing some rumors on [Firm D, which offered a program to members of the public similar to Voyager's Rewards Program].  Checking into [sic] see what you are hearing."  On approximately June 12, 2022, Firm D announced that it was pausing withdrawals from its platform, raising concerns about the platform's solvency.  That day, Firm A sent Executives 1 and 2 a link to Firm D's blog announcing the pausing of withdrawals.

90.     On June 13, 2022, over a month after Voyager personnel internally discussed their understanding that Firm A was a "big investor[]" in the collapsing Terra ecosystem, Executives 1

and 2 messaged Firm A, noting they were "seeing immense demand across assets today" and asked if Firm A would agree to re-rate Voyager's returns to 6% (for BTC) and 12% (for USDC). Firm A agreed.  In the same discussion, Executive 1 stated that, separate from the re-rates, "I think we will need to recall 1,250 BTC today, so the [Firm A] BTC position would go from 15,250 to 14,000."  Executive 1 stated that he knew Firm A "[doesn't] like recalls at times like this, but we are doing it out of an abundance of caution for operational liquidity."

91.     On June 13, 2022, Voyager recalled 1,250 BTC from Firm A.

92.     Around this time, public reports began speculating that Firm A may be insolvent. For example, a June 14 news article noted that "[Firm A's] stETH fire sale began in May, right after the collapse of Terra's UST stablecoin" and speculated that Firm A "may become the latest high-flying company to crash in the bear market."

93.     On June 14, in response to these public reports regarding Firm A's potential insolvency, Voyager recalled the remaining 14,000 BTC and 350 million USDC and requested repayment by June 16, as provided in the Master Loan Agreement.  To date, Voyager has not received any assets from Firm A in response to these recall requests.

**E.     Ehrlich's and Voyager's Concealment of Voyager's Ongoing High-Risk Exposure and Deteriorating Financial Condition**

94.     Beginning at least around June 12, 2022, to ensure its own survival but at the expense of its customers, Voyager initiated a sustained and deliberate campaign to conceal from the public its high-risk exposure to Firm A and its own precarious financial condition. Voyager's goal in doing so was to prevent customers from receiving information that might lead customers to withdraw assets from the Voyager Platform.  Ehrlich and Voyager authorized and/or made the campaign's false and misleading statements from the United States.

95.     On June 12, 2022, Voyager tweeted from its official Twitter account (and Ehrlich retweeted from his personal Twitter account) that "All Voyager products and services are fully operational and remain unaffected by current market conditions, including trading, rewards, deposits, and withdrawals.  We take risk management very seriously, and safeguarding customer assets is our number one priority . . . We have never engaged in DeFi lending activities and have no exposure to stETH.  We continue to be here to serve and support our customers."

96.     Ehrlich and Voyager's statement that Voyager's products and services were "unaffected by current market conditions" was misleading; in fact, Voyager was facing operational liquidity issues and had transferred significant volumes of customer digital assets to various counterparties, including Firm A.  Similarly, Voyager's statements that it had never engaged in DeFi lending activities and had no exposure to stETH were misleading—Voyager in fact was involved in such activities, and did have significant exposure to stETH, through its relationship with Firm A, who participated in those activities and had such exposure.

97.     Similarly, on June 14, 2022, Voyager issued a Press Release titled "Voyager Digital Provides Update on Asset and Risk Management."  Therein, Voyager made numerous misrepresentations regarding its diligence process and the risk profile of its counterparties and omitted critical material facts including that it had significant exposure to Firm A and was facing operational liquidity challenges.  Specifically, in that press release, Voyager represented to the public that "Voyager differentiates itself through a **straightforward, low-risk approach to lending and asset management** by working with a select group of reputable counterparties, **which are all vetted through extensive due diligence** by its Risk Committee.  The company **does not participate in DeFi lending activities, algorithmic stablecoin staking and lending, or derivative assets, such as stETH.**  One of Voyager's important objectives is to **make crypto**

**as simple and safe as possible** for consumer use.  With that mission in mind, safeguarding customer assets is a top priority" (emphasis added).  The press release included a statement from Ehrlich that "our leadership also has deep financial expertise across the sector and has led companies through multiple market cycles . . . . **The company is well capitalized and in a good position to weather this market cycle and protect customer assets.**"

98.    In fact, Voyager had not vetted its counterparties—including Firm A—through anything approaching an "extensive" due diligence process; Voyager did, in fact, participate in all of those activities in which it stated it "[did] not participate" by, at minimum, conveying pooled customer assets to Firm A (who publicly advertised on its own website that it engaged in those activities); and Voyager was not, in fact, "in a good position to weather this market cycle and protect customer assets."

99.    Similarly, on June 14, 2022, Ehrlich tweeted from his personal Twitter account an article headlined "EXCLUSIVE:  Voyager Digital CEO Says 'Customer Assets Are Safe' Amid Crypto Collapse."  The article quoted Ehrlich as stating, "Our financials are public.  You can see everything about us."

100.    At the time, Voyager's current public financial statements indicated in a section titled "Credit Risk" that Voyager limited "credit risk by lending to borrowers that [Voyager] believes, based on its due diligence, to be high quality financial institutions with sufficient capital to meet their obligations as they come due."  However, by this point, Ehrlich and Voyager no longer believed Firm A was a "high quality financial institution[] with sufficient capital to meet [its] obligations as they come due."

101.    The above tweets, press release, and public statements were an intentional attempt to conceal from the public what was becoming clear to Ehrlich and Voyager—that it had been

facing sustained and problematic "operational liquidity" issues; that it had sent over $1 billion of pooled customer assets to high-risk counterparties such as Firm A and Firm B; that Voyager needed those assets back to address those liquidity issues and allow customers to withdraw their assets from the Voyager Platform on demand; that Voyager and its customers faced significant risk of not being paid back given Firm A's apparent insolvency.

102.     Voyager's communications with Firm A on and after June 14 made it clear to Voyager that Firm A was collapsing, its co-founders were nowhere to be found, and that Firm A was not going to repay Voyager's loans.  These facts were also obvious from public reports regarding Firm A's potential insolvency.

103.     For example, on June 14, Executive 2 emailed a Firm A co-founder, Executive 1, and Ehrlich, stating that "we have recalled all our loans this morning and are waiting for acknowledgment from your operations team.  In the meantime, we would like to jump on a call to understand [Firm A's] position.  If you could please let us know that we can get this done as quickly as possible."  That day, Firm A communicated that it was "seeing more clients pull their loans with us;" that any repayment was speculative; that things were "in bad shape" at Firm A; and that no one at Firm A "[has] any answers" regarding Firm A's financial health and future. By the end of the night, the best Firm A could do for Voyager was to link to a tweet from a Firm A co-founder that said, "We are in the process of communicating with relevant parties and fully committed to working this out" and to communicate that Firm A would check in the next morning to see if either Firm A co-founder had responded to him.

104.     The next morning, June 15, Firm A communicated that it had not heard from the Firm A co-founders and they were not responding to messages.

105.    The same morning, a Firm A employee also communicated to Executive 1 that "[i]t seems like [the Firm A co-founders] are working on a bailout, they've been silent, we haven't heard from them yet[.]  At this point, it seems like [Firm A's] counterparties are sending default notices."

106.    At this stage, Ehrlich continued and intensified his direct and personal role in controlling and directing Voyager's concealment of material information from its customers. For example, on June 15, 2022, the Head of Digital Assets Research at a large investment and research firm emailed a Voyager employee, noting that the firm was receiving many calls from clients regarding Voyager, and "what portion of VOYG's loans are fully or overcollateralized? In what other ways are its loans 'low risk'?  Does it extend any loans to crypto hedge funds? While there may be NDAs etc involved it would be great if the company could clear the air on counterparty risk as it did regarding its lack of exposure to [Firm D].  Mainly rumors out there about VOYG having exposure to [Firm A] etc."  The Voyager employee forwarded the email to Ehrlich and others.  Ehrlich replied, "Thanks[.]  Mark reached out to me.  I'll handle when the time is right."

107.    Likewise, on June 15, a Voyager investor emailed a Voyager employee, writing "I appreciate the [June 14] press release from Steve [Ehrlich] yesterday, but it does seem that an aggressive HF [hedge fund] is your second largest counterparty on the lending side and that there are rumors that they are insolvent and not responding to margin calls.  **It's hard to imagine the management team putting out that [June 14] release yesterday if there were significant exposure but any color you could give me would be appreciated.**  We own 3 million shares of Voyager and have always been nervous about this lending program" (emphasis added).  The Voyager employee forwarded this email to Ehrlich and others, writing "People are checking in

on [Firm A] and rumors of their insolvency.  What are you hearing from them?  I will not reply but maybe we put out a release."  Ehrlich replied, "Nothing to comment on yet."

108.    At the same time that Ehrlich was directing Voyager personnel not to comment on Voyager's exposure to Firm A, Voyager (at Ehrlich's direction) was scrambling to borrow funds to cover Firm A's impending default.  For example, on the evening of June 14, Ehrlich personally communicated with a Firm B employee (Firm B Employee 1) regarding a draft term sheet for Firm B, which Ehrlich feared was itself a "house of cards," to potentially provide senior unsecured revolving credit facilities to Voyager (one for USD 350 million, the other for 15,000 BTC) at 5% interest, reflecting Voyager's concerns at the time that Firm A (who had received digital assets from Voyager in almost exactly those amounts) would fail to repay Voyager. Ehrlich's email listed various Voyager loans outstanding at the time totaling approximately $1.7 billion in assets—including approximately $693 million worth of assets to Firm A. After additional discussion, Firm B Employee 1 described the challenges in potentially loaning assets to Voyager, writing that "This isn't about the economics for us.  It isn't about acquiring Voyager as a distressed asset.  I'm trying to help out but also don't want to be dragged into a lose-lose situation.  In the case of the run on the bank, Voyager is worth very little to customers, us or you.  Thereby we would have exhausted the credit facility to no benefit.  What we're looking for is discretion and you're looking for ex-ante quantification of the discretionary factors.  They will be really conservative and not helpful."  Ehrlich replied "We hear you.  Just trying to keep the business afloat."  Firm B Employee 1 also suggested to Ehrlich that loans to numerous other Voyager counterparties should be recalled to avoid other potential defaults.

109.    On June 16, Voyager, through counsel, submitted a Confidential Material Change Report ("CMCR") to the Ontario Securities Commission and other Canadian securities

regulators, noting that Voyager recalled Firm A's "loans," that Firm A had defaulted on its obligations under the Master Loan Agreement, and that Firm A had five days to cure the default. Voyager stated that it would be "premature" to disclose the Firm A exposure and potential non-repayment because Firm A still had time to cure the default, and disclosure of Voyager's exposure could result in customers requesting withdrawals from the Voyager Platform and Voyager's inability to satisfy those withdrawal requests.

110.    At this time, despite privately communicating to the Ontario Securities Commission uncertainty as to whether Firm A might timely cure its default, it was clear to Voyager personnel that Firm A was not going to pay back Voyager.  As described above, public reporting suggested Firm A was likely insolvent; Firm A painted a bleak picture to Voyager personnel regarding Firm A's financial health and Firm A employees stated they could not even get in touch with either of Firm A's co-founders; and Ehrlich was directing Voyager's scramble to borrow funds to cover the likely shortfall.

111.    Still on June 16, Executive 1 communicated with Ehrlich regarding Voyager's efforts to obtain repayment from counterparties other than Firm A, and noting that another counterparty "has been asking to delay settlements" and that "cracks [were] potentially showing" with respect to that counterparty.

112.    Also on June 16, an athlete who Voyager publicly sponsored messaged Ehrlich, asking "Still nothing official on if [Firm A] is falling out though right[?]"  Ehrlich replied, "correct."  The athlete replied, "If they actually do crash, how tight of a spot does that put us?" Ehrlich replied, "cant say."

113.    On June 17, 2022, Voyager issued a press release announcing it had signed a term sheet for $200 million and 15,000 BTC revolving line of credit with Firm B, stating, "The credit

facilities will only be used by Voyager if needed to safeguard customer assets.  In addition to the funds available under the credit facilities, Voyager has more than US$200 million on its balance sheet."  The press release quoted Ehrlich, who stated that "Safeguarding customer assets is always our top priority, and ongoing, prudent risk management as well as a strong balance sheet are two ways that we continue to demonstrate that priority."  The press release did not mention Firm A or Voyager's operational liquidity issues.  Three days later, on June 20, the Ontario Securities Commission communicated to Voyager, "please explain how the June 17, 2022 announcement was not misleading given that there was no mention of the potential default of the [Firm A] loan and the news release said the proceeds are 'intended to be used to safeguard customer assets in light of current market volatility and only if such use is needed.'"

114.    Also on June 17, 2022, Executive 2 sent Firm A and Executive 1 a link to an article stating that battered crypto hedge fund Firm A was considering asset sales and bailouts, and noting that it "[l]ooks like [the Firm A co-founder] has spoken to wsj.  Still no word?"  Firm A indicated the Firm A co-founders had not been in contact with Firm A employees and were still not responding to messages.

115.    At this time, deprived of accurate information regarding Voyager's worsening financial condition, principally its exposure to Firm A, not only were many Voyager customers continuing to store their assets on Voyager's platform, new and existing Voyager customers were *purchasing and transferring additional assets* onto the Voyager Platform.  Indeed, depriving the public of accurate information appears to have been critical to Voyager's efforts to stay afloat— i.e., to keep purchases and deposits coming in, minimize withdrawals, recover assets from other counterparties, and live to fight another day until Voyager figured out a strategy to survive.  In this sense, by this stage, at Ehrlich's direction, Voyager was no different than a Ponzi scheme—

securing contributions from uninformed new depositors to pay back prior depositors who requested their money back, all while keeping everyone in the dark regarding its actual deteriorating financial condition.

116.    For example, on June 18, 2022, Ehrlich discussed with various Voyager personnel the pace of customer withdrawals as well as new purchases and deposits onto the Voyager Platform.  In a chat discussion with Ehrlich and others, Executive 1 stated "I will have to call BTC from [Firm B] today."  Executive 2 asked "Did we eat through the 1,000 btc we got from [another counterparty] already."  Executive 1 responded, "Not yet but trending that way.  Partial settling now with [other counterparties] to get us another 150 BTC."  Ehrlich later responded, "ok on [Firm B]."  Later that day, Executive 1 replied, "If there's a bright spot, its [sic] that USD deposits almost kept pace with USD withdrawals today.  Customers were sending in funds to make purchases - $500k to $1MM per hour.  Also, the NUMBER of USD deposits outpaced the number of withdrawals by 4x . . .BTC comprises 1/3 of all withdrawals we are seeing.  BTC withdraws have outpaced deposits 20 to 1.  ETH and USDC withdrawals have been less than expected and both have been totally manageable so far . . . . Our BTC inventory is running very low, but we should have 2500 BTC back from [Firm B] by midday tomorrow."  Ehrlich replied, "Thanks."

117.    Separately on June 18, Executive 1 messaged with Ehrlich, "Seeing more withdrawals this am than last night.  I will likely have to talk to Firm B for BTC in a few hours unless pace tapers off.  Will hold off as long as I can.  Won't reach out without green light from you."  Ehrlich replied, "Ok.  Keep me posted.  This down market isn't helping us."

118.    On June 20, 2022, Executive 2 asked Firm A, "Hey . . . have you heard anything new yet?"  Firm A indicated that its co-founders still had not communicated with Firm A employees.

119.    On June 20, 2022, the Ontario Securities Commission wrote to Voyager, "Please explain what investors currently know about the substance of the material change based on the Company's previous disclosure.  If the previous disclosure is inconsistent with the contents of the CMCRs, please provide submissions explaining how it is appropriate for investors to continue using the previous disclosure to make their investment decisions.  Your response should also explain whether investors are aware of the (i) significant terms of the agreement such as the ability to demand repayment and existence of a contractual 5 business day cure period, and (ii) whether the issuer's proposed disclosure may surprise investors about the expiry of the cure period.  We are also concerned about the difference between the potential exposure to [Firm A] described in the CMCRs of US$664 million and the issuer's Q1 [Financial Statements] which indicate that the exposure was US$326 million."

120.    On June 20, 2022, Voyager submitted an additional CMCR to the Ontario Securities Commission.  Therein, Voyager continued to argue against public disclosure of Firm A's failure to repay, arguing that Firm A's five days to cure its default had not passed, and disclosure could harm Voyager by incentivizing customers to withdraw assets.

121.    Finally, on June 22, 2022, Voyager publicized details regarding its exposure to Firm A.  That day, Voyager issued a press release announcing that Voyager "may issue a notice of default to [Firm A] . . . for failure to repay its loan.  Voyager's exposure to [Firm A] consists of 15,250 BTC and $350 million USDC.  The Company . . . requested repayment of the entire balance of USDC and BTC by June 27, 2022 . . . . [This amount has not] been repaid, and failure

by [Firm A] to repay . . . will constitute an event of default.  Voyager intends to pursue recovery

from [Firm A] and is in discussions with the Company's advisors regarding the legal remedies

available.  The Company is unable to assess at this point the amount it will be able to recover

from [Firm A]."

122.    Even in this press release, Voyager failed to disclose its operational liquidity

issues and the fact that the pace of new purchases and deposits onto the Voyager Platform and

Voyager's ability to recoup assets from other borrowers would likely influence its ability to

honor customer withdrawal requests going forward.  Indeed, behind the scenes, Voyager

personnel acknowledged that its financial situation was far direr than its press release disclosed.

In reality, Voyager was hanging by a thread.  On June 23, 2022, Executive 1 wrote to other

Voyager personnel that it was "safe to say that if conversions from USDC [to] USD continue at

the pace we saw today we have about 1 day if we get the 75MM from [Firm B], 2 days if we get

the 100MM novation . . . [I'm] torn about how to handle [a Firm B drawdown] as I don't want to

seem pushy and panicked to them as it may influence how they treat us over the next few days."

123.    Also on June 23, Executive 2 asked Ehrlich for permission to send a going-

forward financial forecast to Firm B.  After reviewing the forecast, Ehrlich asked, "**is it that bad**

or did we put a cushion in here?" (emphasis added).  Executive 2 replied with various pieces of

information, concluding with "no cushion."

124.    On June 25, 2022, based on misleading and incomplete information regarding

Voyager's precarious financial health, members of the public continued to purchase assets on

Voyager's platform.  That day, Ehrlich discussed internally a note from his business operations

team that "[t]here has been essentially zero net selling of USDC over last 4 hours and users have

actually bought more BTC than sold for the day."  Another Voyager employee wrote, "This is very good news," to which Ehrlich replied, "Yep."

125.    On June 27, 2022, Voyager issued another press release, noting it had issued a notice of default to Firm A and that "[t]he platform continues to operate and fulfill customer orders and withdrawals," described its cash and owned crypto assets on hand, and noted that it had access to the previously announced lines of credit from Firm B.

126.    Once again, this press release did not disclose to the public just how precarious Voyager's financial position was.  In another CMCR to Canadian securities regulators dated June 27, Voyager argued against the level of detailed disclosure of financial and balance sheet updates suggested by the Ontario Securities Commission, because, in Voyager's view, that could accelerate customer withdrawals.  "The Company intends to issue a press release . . . when the Company has determined that it is necessary to cease satisfying customer withdrawal requests." In other words, Voyager's position was, essentially, that it did not want the public to know how bad things were, because if the public knew how bad things were, customers would not continue to store their assets on the Voyager Platform; and that Voyager would only tell the public how bad things were once it was too late for customers to do anything to protect themselves.

127.    On July 1, 2022, Voyager issued a press release stating it was "temporarily suspending trading, deposits, withdrawals and loyalty rewards . . . ."

128.    On approximately July 6, Voyager announced it had filed for bankruptcy.

129.    Voyager's customers suffered massive losses as a result of Voyager's reckless treatment of customer assets and concealment of its exposure to Firm A and deteriorating financial condition.  In the Voyager Bankruptcy, Voyager owed its U.S. customers over $1.7 billion.

F.   **Voyager's Operation of the Voyager Platform as a Common Enterprise**

130.   Starting in mid-2018 and continuing through the Relevant Period, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise) marketed and operated the Voyager Platform, which allowed customers across the United States to purchase, sell, trade, and store various digital asset commodities on the Voyager Platform.

131.   Ehrlich served as CEO of each entity in the common enterprise, and each entity played critical and interrelated roles in marketing and operating the Voyager Platform.

132.   For example, Voyager Ltd. is a publicly traded Canadian company that issued financial statements providing information regarding the Voyager Platform, and marketed the Voyager Platform by issuing press releases.  On the system issuers use to file public securities documents and information with Canadian Securities Administrators, Voyager Ltd. listed a New York City address as its mailing and head office address and CEO Ehrlich as its contact.

133.   Voyager Holdings is a wholly owned subsidiary of Voyager Ltd. which, in its Bankruptcy Petition in the above-described Bankruptcy Case, listed for its principal place of business the same New York City address as Voyager Ltd. listed, as described above. Voyager Holdings maintains a centralized master operating account at a bank that transfers virtually all of Voyager's cash to multiple Voyager bank accounts, as well as a separate operating account which funds each Voyager entity's payroll, employee compensation and benefits, and rent for each Voyager entity's office space.  Voyager Holdings entered into the agreement with Firm B for a revolving credit facility as described above, which Voyager Ltd. guaranteed.

134.   Voyager LLC is a wholly owned subsidiary of Voyager Holdings.  In its press releases, Voyager Ltd. repeatedly characterized Voyager LLC as "a cryptocurrency platform in the United States."  Voyager's website states that "[a]ll services" reflected on the website are

"provided by Voyager Digital, LLC."  Voyager LLC maintains a master operating account at a bank used to facilitate customer purchases and sales of digital assets through Voyager's mobile application, and Voyager has represented that all digital assets traded via that mobile application are held at Voyager LLC.

135.    Voyager Ltd., Voyager Holdings, and Voyager LLC each filed for bankruptcy pursuant to a single authorization of the Voyager Ltd. Board of Directors and a single Secretary Certificate signed by a single Authorized Signatory for all three entities, and supported by a single declaration from Ehrlich.  The Ehrlich declaration repeatedly characterizes all three "Debtors" as a single "Company," as having a single "treasury team," as operating a single business, as having a single set of customers, and as having a single "viable business and a plan for the future."  In an exhibit to Ehrlich's declaration, Ehrlich further cited "the integrated nature of the Debtors' operations" as evidentiary support for the Debtors' motion for joint administration of each Voyager entity's bankruptcy case.

**G.    Voyager's Actions as a CPO and Failure To Register with the Commission**

136.    Voyager LLC solicited, accepted, or received digital asset commodities directly from customers, who became pool participants.  Voyager then pooled those assets together in the Voyager Pool and conveyed them to third parties such as Firm A.  For example, Voyager LLC was the counterparty to the Master Loan Agreement and related term sheets with Firm A.

137.    Voyager solicited, accepted, or received digital asset commodities for the purpose of trading commodity interests with those assets.  Voyager transferred those pooled assets to Firm A, who Voyager understood would further pool those assets to trade commodity interests to generate revenue to pay Voyager returns.  Voyager intended to use those return payments from third parties to, at least in part, fund Voyager's Rewards Program, pursuant to which Voyager LLC made payments back to customers.

138.    In choosing to structure its business in the manner described herein, Voyager operated a commodity pool and failed to register with the Commission as a CPO.

139.    Prior to negotiating the Master Loan Agreement with Voyager LLC, Firm A had long publicized its involvement in digital asset (largely BTC) derivatives trading.  For example, on approximately February 24, 2021, on a crypto-focused news program publicly available on YouTube, a Firm A co-founder extensively discussed Firm A's volatility trading strategies on BTC options.

140.    As recently as early 2018, Firm A's investment advisor had claimed exemption from registration with the Commission as a commodity trading advisor because Firm A was a commodity pool that was organized and operated outside of the United States, pursuant to Regulation 4.14(a)(8), 7 C.F.R. § 4.14(a)(8) (2022).

141.    Similarly, Firm A's offering documents for certain investors highlighted its digital asset derivatives trading.  For example, in an October 2021 Firm A Confidential Offering Memorandum (which Voyager, consistent with its inadequate diligence process, did not request or receive), Firm A stated that Firm A would invest in "listed futures" and "digital assets," among other investments, with "digital assets" defined to include digital asset-based futures contracts, options, and swaps, and other digital asset derivatives.

142.    Voyager was aware that Firm A and certain additional counterparties to whom it conveyed pooled digital asset commodities intended to trade commodity interests such as BTC futures, options, and swaps.  For example, on or around March 1, 2022, Voyager personnel held a call with a Firm A co-founder, who communicated, among other things, that Firm A's trading focused on BTC; that Firm A engaged in spot-futures arbitrage trading; that it traded on various derivatives trading platforms; and that DeFi fell within its mandate.  Similarly, Voyager's Master

Loan Agreement with Firm A contemplated that Firm A could trade "futures or options contracts relating to the [transferred digital assets, which were ultimately BTC and USDC]" and provided for delay of Firm A's return of transferred digital assets in the event of certain "market disruption events" related to such futures or options markets.

143.   Master Loan Agreements between Voyager LLC and multiple additional counterparties similarly contemplated such futures or options trading.

144.   Other counterparties to which Voyager directed pooled Voyager customer assets also represented to Voyager that they traded derivatives.  For example, Firm C communicated that its activities included lending, borrowing, spot trading, and derivatives trading, and that 35–40% of its activities were in BTC or ETH.  Another communicated that it traded significant amounts of BTC and USDC and that it historically remained market-neutral through, among other things, trading derivatives.

145.   In February through May 2022, when Voyager was negotiating the Master Loan Agreement with Firm A and subsequently transferring pooled customer assets to Firm A, Firm A's investment program did, in fact, include futures, options, swaps, and other derivatives on digital assets, just as it had discussed publicly as well as represented to Voyager. For example, in approximately May 2022, Firm A's records reflected positive balances at multiple trading platforms in accounts used solely for derivatives transactions, including BTC swaps such as "perpetual swaps" (sometimes referred to as "perpetual futures" or "perpetuals") that allow counterparties to indefinitely establish long or short positions in the underlying asset.

146.   During the Relevant Period, Voyager, by and through its officers, employees or agents, used the mails, electronic mails, wire transfers, websites, and other means or

instrumentalities of interstate commerce, to solicit pool participants and prospective pool

participants and/or to accept or receive funds or property from pool participants.

147.    During the Relevant Period, Voyager never registered with the Commission as a

CPO.

148.    During the Relevant Period, Voyager was not statutorily exempt or excluded from

registration as a CPO and never filed any electronic or written notice with the National Futures

Association that it was exempt or excluded from registration as a CPO, as required by

Regulations 4.5(c) and 4.13(b)(1), 17 C.F.R. §§ 4.5(c), 4.13(b)(1) (2022).

**H.**    **Voyager's Failure To Provide Pool Disclosure Documents**

149.    Voyager, while acting as a CPO of the Voyager Pool, failed to provide pool

disclosure documents as required by Regulation 4.21, 17 C.F.R. § 4.21 (2022), including but not

limited to documents providing or describing required cautionary statements, risk disclosures,

fees and expenses incurred, past performance disclosures, and others.

**I.**    **Ehrlich's Solicitation of Customers To Purchase and Store Digital Assets on the Voyager Platform and Failure To Register as an AP of a CPO**

150.    Starting in mid-2018 and continuing through the Relevant Period, Ehrlich, as

Voyager Ltd.'s, Voyager Holdings', and Voyager LLC's CEOs, solicited customers to purchase

digital assets on, store digital assets on, and otherwise utilize the Voyager Platform.

151.    During the same time period, from his personal Twitter account and elsewhere,

Ehrlich acted as the public face of Voyager, promoted Voyager's business, and further solicited

members of the public to purchase digital assets on, store digital assets on, and otherwise utilize

the Voyager Platform.

152.     During the same time period, Ehrlich retweeted from his personal Twitter account Voyager tweets promoting its business, including announcing Ehrlich's appearances to promote Voyager.

153.     During the same time period, Ehrlich tweeted regarding various Voyager features and advocated that members of the public download and utilize the Voyager Platform.

154.     During the Relevant Period, Ehrlich tweeted from his personal Twitter account various examples of Ehrlich using the Voyager Debit Card, which, according to Voyager's website, "earns like crypto and spends like cash," and was advertised as a benefit of purchasing or storing digital assets on the Voyager Platform.  On approximately June 8, 2022, Ehrlich retweeted from his personal Twitter account a tweet stating "The number of inbound transfers of $USDC into @investvoyager have exploded since the debit card release.  Pretty clear its attracting new customers."

155.     Ehrlich never registered with the Commission as an AP of a CPO.

**J.      Ehrlich's Control Over Voyager's Business Decisions**

156.     As the examples above make clear, during the Relevant Period, Ehrlich, as Voyager Ltd., Voyager Holdings, and Voyager LLC's CEOs, was aware of, had the power to change, and in many cases explicitly made and/or authorized representations to the public regarding how Voyager would treat assets; led the Loan Risk Committee responsible for conducting diligence on and ultimately approving lending relationships with third parties including Firm A; approved specific transfers to those third parties; and was fully looped in regarding and personally directed Voyager's decision making as to what to disclose to the public regarding Voyager's exposure to Firm A and deteriorating financial condition in 2022.

157.     In his declaration filed at the outset of Voyager's bankruptcy, Ehrlich wrote that "I am generally familiar with the Debtors' day-to-day operations, business and financial affairs,

and books and records." In that declaration, Ehrlich provided detailed information regarding

Voyager's business operations.

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT ONE

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3),
17 C.F.R. § 180.1(a)(1)–(3) (2022)
(Fraud)**

158.   Paragraphs 1 through 157 are re-alleged and incorporated herein by reference.

159.   Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person,

directly or indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap, or a
> contract of sale of any commodity in interstate commerce, or for future delivery on
> or subject to the rules of any registered entity, any manipulative or deceptive device
> or contrivance, in contravention of such rules and regulations as the Commission
> shall promulgate . . . .

160.   Regulation 180.1(a), 17 C.F.R. § 180.1(a), provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any
> swap, or contract of sale of any commodity in interstate commerce, or contract for
> future delivery on or subject to the rules of any registered entity, to intentionally or
> recklessly:   (1) Use or employ, or attempt to use or employ, any manipulative
> device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or
> misleading statement of a material fact or to omit to state a material fact necessary
> in order to make the statements made not untrue or misleading; [or] (3) Engage, or
> attempt to engage, in any act, practice, or course of business, which operates or
> would operate as a fraud or deceit upon any person.

161.   By reason of the foregoing, at least during the Relevant Period, Voyager Ltd.,

Voyager Holdings, and Voyager LLC (acting as a common enterprise) and Ehrlich intentionally

or recklessly, in connection with any swap, or contract of sale of any commodity in interstate

commerce, or contract for future delivery on or subject to the rules of any registered entity,

directly or indirectly:   used or employed, or attempted to use or employ, a scheme or artifice to

defraud; made, or attempted to make, untrue or misleading statements of a material fact or

omitted to state a material fact necessary in order to make the statements made not untrue or misleading; and/or engaged, or attempted to engage, in acts, practices, or courses of business that operated or would operate as a fraud or deceit on any person, including, but not limited to, Voyager customers.

162.    By reason of the foregoing, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise) and Ehrlich violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

163.    The acts or omissions of Ehrlich and other Voyager officers, employees, or agents described in this Complaint were done within the scope of their office, employment, or agency with Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise). Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), Voyager Ltd., Voyager Holdings, and Voyager LLC are liable as principals for each act, omission, or failure of Ehrlich and the other officers, employees, or agents acting for Voyager Ltd., Voyager Holdings, and Voyager LLC constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

164.    Ehrlich directly or indirectly controlled Voyager Ltd., Voyager Holdings, and Voyager LLC and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) committed by Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise).  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Ehrlich is also liable as a control person for each of Voyager Ltd.'s, Voyager Holdings', and Voyager LLC's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

165.    Each and every use or employment or attempted use or employment of a scheme or artifice to defraud; or act of making or attempting to make untrue or misleading statements of a material fact or omitting to state a material fact necessary in order to make the statements not untrue or misleading; and act of engaging, or attempting to engage, in the acts, practices, or courses of business that operated or would have operated as a fraud or deceit on any person, including Voyager customers, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

## COUNT TWO

**Violation of Section 4*o*(1)(A)–(B) of the Act, 7 U.S.C. § 6*o*(1)(A)–(B)**
**(Fraud and Deceit by CPOs and APs of CPOs)**

166.    Paragraphs 1 through 157 are re-alleged and incorporated herein by reference.

167.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a commodity pool operator, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
>
> (I)    commodity for future delivery, security futures product, or swap . . . .

168.    By reason of the foregoing, at least during the Relevant Period, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise) engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity

interests; therefore, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise) acted as a CPO, as defined by 7 U.S.C. § 1a(11).

169.    Regulation 1.3, 17 C.F.R. § 1.3 (2022), defines an associated person of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

170.    By reason of the foregoing, from at least February 28, 2022 to July 5, 2022, Ehrlich was associated with a CPO as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, or the supervision of any person or persons so engaged.  Therefore, Ehrlich was an AP of a CPO as defined by 17 C.F.R. § 1.3.

171.    7 U.S.C. § 6*o*(1)(A)–(B) prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

172.    By reason of the foregoing, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise), and Ehrlich, through use of the mails or any means or instrumentality of interstate commerce:  (1) knowingly or recklessly employed devices, schemes or artifices to defraud pool participants and prospective pool participants; or (2) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon pool participants or prospective pool participants.

173.    By reason of the foregoing, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise), and Ehrlich violated 7 U.S.C. § 6*o*(1)(A)–(B).

174.    The acts or omissions of Ehrlich and other officers, employees, or agents acting for Voyager Ltd., Voyager Holdings, and Voyager LLC described in this Complaint were done within the scope of their office, employment, or agency with Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise).  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Voyager Ltd., Voyager Holdings, and Voyager LLC are liable as principals for each act, omission, or failure of Ehrlich and the other officers, employees, or agents acting for Voyager Ltd., Voyager Holdings, and Voyager LLC constituting violations of 7 U.S.C. § 6*o*(1)(A)–(B).

175.    Ehrlich directly or indirectly controlled Voyager Ltd., Voyager Holdings, and Voyager LLC and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6*o*(1) committed by Voyager Ltd., Voyager Holdings, and Voyager LLC.  Therefore, pursuant to 7 U.S.C. § 13c(b), Ehrlich is also liable as a control person for each of Voyager Ltd., Voyager Holdings, and Voyager LLC's violations of 7 U.S.C. § 6*o*(1)(A)–(B).

176.    Each misrepresentation and omission of material fact, including those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)–(B).

### COUNT THREE

**Violation of Sections 4k(2) and 4m(1) of the Act,
7 U.S.C. §§ 6k(2), 6m(1)
(Failure to Register as a CPO and AP of a CPO)**

177.    Paragraphs 1 through 157 are re-alleged and incorporated herein by reference.

178.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

179.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) states that it shall be

> [U]nlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged,

> unless such person is registered with the Commission under this chapter as an [AP] of such [CPO] . . . .

180.     By reason of the foregoing, at least during the Relevant Period, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise) engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests; therefore, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise) acted as a CPO, as defined by 7 U.S.C. § 1a(11).

181.     Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise), while using the mails or means of interstate commerce in connection with their business as a CPO, have never been registered with the Commission as a CPO.

182.     By reason of the foregoing, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise) acted as an unregistered CPO in violation of 7 U.S.C. § 6m(1).

183.    By reason of the foregoing, at least during the Relevant Period, Ehrlich associated with a CPO (as defined by 7 U.S.C. § 1a(11)) as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool or the supervision of persons so engaged; therefore, Ehrlich acted as an AP of a CPO as defined by 17 C.F.R. § 1.3.

184.    Ehrlich has never been registered with the Commission as an AP of a CPO.

185.     By reason of the foregoing, Ehrlich acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2).

186.    The acts or omissions of Ehrlich and other officers, employees, or agents acting for Voyager Ltd., Voyager Holdings, and Voyager LLC described in this Complaint were done within the scope of their office, employment, or agency with Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise).  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Voyager Ltd., Voyager Holdings, and Voyager LLC are liable as principals for each act, omission, or failure of Ehrlich and the other officers, employees, or agents acting for Voyager Ltd., Voyager Holdings, and Voyager LLC constituting violations of 7 U.S.C. § 6k(2).

187.    Ehrlich directly or indirectly controlled Voyager Ltd., Voyager Holdings, and Voyager LLC and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6m(1) committed by Voyager Ltd., Voyager Holdings, and Voyager LLC.  Therefore, pursuant to 7 U.S.C. § 13c(b), Ehrlich is also liable as a control person for each of Voyager Ltd., Voyager Holdings, and Voyager LLC's violations of 7 U.S.C. § 6m(1).

188.    Each instance that Voyager Ltd., Voyager Holdings, or Voyager LLC (acting as a common enterprise) acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

189.    Each instance that Ehrlich acted as an AP of a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

## COUNT FOUR

### Violation of Regulation 4.21, 17 C.F.R. § 4.21 (2022)
### (Failure to Provide Pool Disclosure Documents)

190.    Paragraphs 1 through 157 are re-alleged and incorporated herein by reference.

191.    17 C.F.R. § 4.21(a)(1) provides that

> [E]ach commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . .

192.    By reason of the foregoing, at least during the Relevant Period, Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise) were required to be registered with the Commission as a CPO, but Voyager Ltd., Voyager Holdings, and Voyager LLC (acting as a common enterprise) failed to provide prospective pool participants with pool disclosure documents in the form specified in Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2022).

193.    By reason of the foregoing, Voyager Ltd., Voyager Holdings, and Voyager LLC violated 17 C.F.R. § 4.21.

194.    Ehrlich directly or indirectly controlled Voyager Ltd., Voyager Holdings, and Voyager LLC and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 17 C.F.R. § 4.21 committed by Voyager Ltd., Voyager Holdings, and

Voyager LLC.  Therefore, pursuant to 7 U.S.C. § 13c(b), Ehrlich is also liable as a control person for each of Voyager Ltd., Voyager Holdings, and Voyager LLC's violations of 17 C.F.R. § 4.21.

195.    Each failure to furnish the required disclosure documents to prospective pool participants and pool participants, including those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.21.

## VI.    RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.  An order finding that Defendant violated Sections 4k(2), 4m(1), 4o(1)(A)–(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)–(B), 9(1), and Regulations 4.21(a)(1) and 180.1(a)(1)–(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)–(3) (2022);

B.  An order of permanent injunction enjoining Defendant, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)–(B), and 9(1), and 17 C.F.R. §§ 4.21(a)(1) and 180.1(a)(1)–(3);

C.  An order of permanent injunction restraining and enjoining Defendant, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

i.  Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

    ii.   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)), or digital assets that are commodities (as that term is described herein), for their own personal account(s) or for any account in which the Defendant has a direct or indirect interest;

    iii.   Having any commodity interests or digital assets that are commodities traded on the Defendant's behalf;

    iv.   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital assets that are commodities;

    v.   Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interest or digital assets that are commodities;

    vi.   Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and/or

    vii.   Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9));

D.  An order requiring Defendant to pay a civil monetary penalty of not more than the civil monetary penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-

1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation

Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, title VII,

Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each

violation of the Act or Regulations, plus post-judgment interest;

E.  An order directing Defendant, as well as any successors thereof, to disgorge, pursuant

to such procedure as the Court may order, all benefits received including, but not

limited to, trading profits, revenues, salaries, commissions, fees, or loans derived

directly or indirectly from acts or practices which constitute violations of the Act and

Regulations, as described herein, and pre- and post-judgment interest thereon from

the date of such violations;

F.  An order directing Defendant, as well as any successors thereof, to make full

restitution, pursuant to such procedure as the Court may order, to every customer and

investor whose funds Defendant received, or caused another person or entity to

receive, as a result of the acts and practices constituting violations of the Act and

Regulations, as described herein, and pre- and post-judgment interest thereon from

the date of such violations;

G.  An order directing Defendant, as well as any successors thereof, to rescind, pursuant

to such procedure as the Court may order, all contracts and agreements, whether

express or implied, entered into between, with, or among Defendant and any

customer or investor whose funds were received by the Defendant as a result of the

acts and practices which constituted violations of the Act and the Regulations, as

described herein;

H.  An order directing that Defendant, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to investors and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least the beginning of the Relevant Period to the date of such accounting;

I.  An order requiring Defendant and any successors thereof to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

J.  An order providing such other and further relief as the Court deems proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated:  October 12, 2023                          Respectfully submitted,

                                                  **COMMODITY FUTURES TRADING COMMISSION**

                                                  By:  */s/ Alan T. Simpson*
                                                  Rachel Hayes (*Pro Hac Vice to be filed*)
                                                  rhayes@cftc.gov
                                                  Missouri Bar No. 48713
                                                  Alan T. Simpson (*Pro Hac Vice to be filed*)
                                                  asimpson@cftc.gov
                                                  Missouri Bar No. 65183
                                                  Attorneys for Plaintiff
                                                  COMMODITY FUTURES TRADING COMMISSION
                                                  2600 Grand Boulevard, Suite 210
                                                  Kansas City, MO  64108
                                                  (816) 960-7700