USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __8/29/24__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
COMMODITY FUTURES TRADING COMMISSION,

                       Plaintiff,

            -against-                               23-cv-08962 (LAK)

STEPHEN EHRLICH,

                       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION DENYING
## DEFENDANT'S MOTION TO DISMISS

Appearances:

> Rachel Hayes
> Alan T. Simpson
> COMMODITY FUTURES TRADING COMMISSION
> *Attorneys for Plaintiff*
>
> Helen Harris
> Matthew Letten
> DAY PITNEY LLP
>
> Sarah Krissoff
> COZEN O'CONNOR
>
> *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        The Commodity Exchange Act (the "Act") requires commodity pool operators

("CPOs") to register with the Commodity Futures Trading Commission ("CFTC") and to abide by

2

certain other statutory and regulatory requirements.  In this case, the CFTC alleges that Voyager,[1] a now bankrupt digital asset platform, was an unregistered CPO and that its co-founder and former chief executive officer ("CEO"), defendant Stephen Ehrlich, was an unregistered associated person ("AP") of a CPO.[2]  It alleges also that Ehrlich and Voyager defrauded Voyager's customers.  Ehrlich moves to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[3]  For the reasons explained below, the motion is denied.

*Facts*

From February 2018 to July 2022, Voyager and Ehrlich operated the Voyager Platform, a digital asset trading and custody platform.[4]  Simply stated, the Voyager Platform allowed customers to buy, sell, trade, and store digital assets such as crypto currencies (*e.g.*, Bitcoin).[5]  Two selling points differentiated Voyager's offering: the promise that "Voyager would operate with the same level of rigor and trust as traditional financial institutions"[6] and the Rewards Program, which

---

[1]
    The complaint refers to several Voyager entities collectively as "Voyager."  Those entities include, Voyager Digital Ltd., Voyager Digital Holdings, Inc., and Voyager Digital, LLC.

[2]
    The complaint alleges that Ehrlich is liable as a control person for Voyager's alleged violations of commodities laws and regulations.  Dkt 1 (Compl.) at ¶ 156.

[3]
    Dkt 15.

[4]
    Dkt 1 (Compl.) at ¶¶ 1–2. As it must, the Court accepts as true the factual allegations put forth in the CFTC's complaint.

[5]
    *Id*. at ¶ 28.

[6]
    *Id*. at ¶ 3 (internal quotation marks omitted).

paid customers interest on assets held on the Voyager Platform.[7]  These returns often substantially exceeded those available from, for example, interest-bearing accounts at traditional financial institutions.[8]

In order to fund the Rewards Program, Voyager generated revenue in two principal ways.  First, Voyager charged transaction fees.[9]  Second, "Voyager pooled the digital asset commodities that its customers purchased or stored and transferred certain of those pooled assets to third parties" in the form of "putative loans."[10]  These loans would prove Voyager's undoing.

For a time, however, Voyager was successful.  "Based on Ehrlich and Voyager's promises of high-yield returns and responsible safekeeping, the Voyager Platform facilitated the sale, purchase, and storing of billions of dollars' worth of digital asset commodities."[11]  Indeed, "[d]uring the Relevant Period," which the complaint defines as February 28, 2022 through July 5, 2022, "the value of the digital asset[s] . . . stored on the Voyager Platform often exceeded $2 billion."[12]

A significant proportion of these assets were "pooled" and "transferred . . . to multiple

---

[7]     *Id*. at ¶¶ 4, 38.

[8]     *Id*.

[9]     *Id*. at ¶ 34.

[10]     *Id*. (internal quotation marks omitted); *see id*. at ¶ 56.

[11]     *Id*. at ¶ 5.

[12]     *Id*.

4

high-risk third parties (including Firms A–D)" in the form of loans.[13]  Firm A, in particular, received

over $650 million worth of digital assets from Voyager.[14]  Despite the materiality of this lending

activity — the loans to Firm A alone were "sufficient to bankrupt Voyager in the event of

non-repayment" — Voyager never conducted "any meaningful diligence" of its borrowers' ability

to repay loans.[15]  Thus, before lending to it, Voyager "did not receive Firm A income statements,

cash flow statements, balance sheets, or even a debt-to-asset ratio," and "Voyager did not conduct

any stress testing of Firm A's liquidity."[16]  Firm A did, however, disclose to Voyager that it "planned

to use Voyager's transferred assets to engage in spot-futures arbitrage trading."[17]  Voyager lent to

Firm A, among others, because it "needed significant revenue to help fund its Rewards Program and

to be able to pay the promised return to customers for storing their assets on the Voyager Platform."[18]

In May 2022, the price of two crypo currencies associated with the Terra blockchain

ecosystem, terraUSD ("UST") and LUNA, collapsed.[19]  As Voyager knew, Firm A had "significant

---

[13]  *Id*. at ¶ 46.  At some times, Voyager's loans to just three borrowers represented over three-quarters of total assets held on the platform.  *Id*. at ¶ 87.

[14]  *Id.* at ¶ 47.

[15]  *Id*.

[16]  *Id*. at ¶ 58.

[17]  *Id*. at ¶ 66.

[18]  *Id*. at ¶ 50.

[19]  *Id*. at ¶ 81.

equity investments in the Terra Luna ecosystem."[20]  In response, Voyager attempted to assess Firm A's exposure to this downturn.[21]  Voyager itself also "beg[an] to experience its own operational liquidity issues."[22]  On June 13, 2022, with concern swirling over the stability of the Luna ecosystem, generally, and Firm A, specifically, Voyager recalled 1,250 Bitcoins (worth tens of millions of U.S. dollars) it had loaned to Firm A.[23]  The next day, Voyager recalled its remaining loans to Firm A.[24]

"Beginning . . . around June 12, 2022, to ensure its own survival but at the expense of its customers, Voyager," authorized by Ehrlich, "initiated a sustained and deliberate campaign to conceal from the public its high-risk exposure to Firm A and its own precarious financial condition."[25]  Its "goal in doing so was to prevent customers from receiving information that might lead customers to withdraw assets from the Voyager Platform."[26]  For example, Voyager tweeted and Ehrlich retweeted reassurance that "[a]ll Voyager products and services are fully operational and

---

[20]
    *Id*. at ¶ 82; *see id.* at ¶ 83.

[21]
    *Id*. at ¶ 85.

[22]
    *Id*. at ¶ 86 (internal quotation marks omitted).

[23]
    *Id*. at ¶¶ 88–91.

[24]
    *Id*. at ¶ 93.

[25]
    *Id*. at ¶ 94.

[26]
    *Id*.

6

remain unaffected by current market conditions . . . . We take risk management very seriously . . . .
We have never engaged in DeFi lending activities and have no exposure to stETH."[27]  These
statements, alleges the complaint, were false.[28]

Firm A never repaid Voyager.[29]  On July 6, 2022, Voyager announced that it was
bankrupt.[30]  As a result, Voyager's customers lost over $1.7 billion.[31]

Based on these substantive allegations, the CFTC brought a four-count complaint
against Ehrlich.  Counts One and Two allege fraud.  Count Three alleges that Voyager failed to
register as a commodity pool operator and that Ehrlich failed to register as an AP of a CPO.  Count
Four alleges that Voyager failed to provide required CPO disclosure documents to prospective
customers.

---

[27]

       *Id*. at ¶ 95 (second alteration in original).

       "DeFi" stands for "Decentralized finance" and "stETH" stands for "staked ether," a type of
digital asset.  Dkt 21 (Pl. Mem.) at 11 n.4

[28]

       Dkt 1 (Compl.) at ¶ 96.

[29]

       *Id.* at ¶ 93.

[30]

       *Id*. at ¶ 128.

[31]

       *Id*. at ¶ 129.

*Discussion*

Ehrlich moves to dismiss Count One on the ground that the complaint fails to allege that he acted with the requisite *scienter*. Ehrlich moves to dismiss Counts Two, Three, and Four on the grounds that Voyager was not a CPO and that he was not an AP of a CPO. For the reasons that follow, the Court denies the motion.

## I.    *Legal Standard*

The legal standard applicable to motions to dismiss for failure to state a claim is well-established:[32]

> "To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts 'to state a claim to relief that is plausible on its face.'[33] In most cases, a claim is facially plausible if 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'[34] This pleading requirement is not onerous — it is satisfied by 'a short and plain statement of the claim showing that the pleader is entitled to relief.'[35]

---

[32]

*In re Didi Glob. Inc. Sec. Litig.*, No. 21-cv-05807 (LAK), 2024 WL 1119483, at *3–4 (S.D.N.Y. Mar. 14, 2024).

[33]

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[34]

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[35]

Fed. R. Civ. P. 8(a)(2).

8

Complaints alleging . . . fraud, however, are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).[36]  'Rule 9(b) . . . require[s] a . . . fraud complaint to (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'[37]  With regard to Rule 9(b), the Court of Appeals has cautioned that, '[a]lthough pleading standards are heightened for . . . fraud claims, we must be careful not to mistake heightened pleading standards for impossible ones.'[38]

In deciding a motion to dismiss, a court 'accept[s] as true all factual allegations and draw[s] from them all reasonable inferences' in the plaintiff's favor, but it is 'not required to credit conclusory allegations or legal conclusions couched as factual allegations.'"[39]

A complaint "is deemed to include any written instrument attached to it as an exhibit

---

[36]

    *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

[37]

    *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462–63 (2d Cir. 2019) (internal quotation marks omitted).

[38]

    *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (internal quotation marks omitted).

[39]

    *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019) (quoting *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014)).

or any statements or documents incorporated in it by reference."[40]  "Where a document is not incorporated by reference, the court may [nevertheless] consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."[41] Although courts may take judicial notice of certain indisputably authentic documents not filed with or incorporate into a complaint, they may not consider such documents "for the truth of the matters asserted" therein.[42]

## II.    *Whether the Complaint States a Claim for Fraud*

Ehrlich argues that Count One should be dismissed for failure to state a claim because the complaint fails to allege that he acted with the requisite *scienter*.  This argument fails because the complaint alleges that Ehrlich made materially false statements that he knew or should have known were false.

### A.    *Elements*

Count One alleges that Ehrlich violated Section 6(c)(1) of the Act, which makes it "unlawful for any person" to use "any manipulative or deceptive device or contrivance" "in connection with any swap, or a contract of sale of any commodity" in such a way as to contravene

---

[40]  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

[41]  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

[42]  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

regulations promulgated by the CFTC.[43]  To state a claim under Section 6(c)(1) and its implementing

regulation, Regulation 180.1(a), the CFTC must allege that Ehrlich "engaged in prohibited conduct

. . . ; with *scienter*; and in connection with a contract of sale of a commodity in interstate

commerce."[44]

       With regard to *scienter*, Rule 9(b) requires a plaintiff to "allege facts that give rise

to a strong inference of fraudulent intent."[45]  To plead a "strong inference," a complaint must allege

"facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2)

strong circumstantial evidence of conscious misbehavior or recklessness."[46]  In considering whether

a complaint adequately alleges *scienter*, a court views the "facts alleged . . . collectively" and does

---

[43]

    7 U.S.C. § 9(1).

    The statute defines "unlawful manipulation" to include making "a false or misleading or
inaccurate report concerning . . . market information or conditions that affect or tend to affect
the price of any commodity in interstate commerce, knowing, or acting in reckless disregard
of the fact that such report is false, misleading or inaccurate."  7 U.S.C. § 9(1)(A).

    Regulation 180.1 makes it unlawful "to intentionally or recklessly: (1) Use or employ, or
attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make
. . . any untrue or misleading statement of a material fact or to omit to state a material fact
necessary in order to make the statements made not untrue or misleading; (3) Engage, or
attempt to engage, in any act, practice, or course of business, which operates or would
operate as a fraud or deceit upon any person."  17 C.F.R. § 180.1(a).

[44]

    *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018); *see CFTC v. Gorman*, 587
F. Supp. 3d 24, 40 (S.D.N.Y. 2022).

[45]

    *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

[46]

    *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 198.

"not . . . scrutinize[]" "individual allegation[s] . . . in isolation."[47]

> B.    *The Complaint Adequately Alleges* Scienter

The CFTC argues that the complaint alleges *scienter* because it pleads facts evincing Ehrlich's conscious misbehavior or recklessness.  To do this, a complaint must allege that a defendant "knew facts or had access to information suggesting that their public statements were not accurate . . . or . . . failed to check information they had a duty to monitor."[48]  The complaint does this in spades, identifying multiple instances in which Ehrlich had "knowledge of facts or access to information contradicting [his] public statements."[49]

For example, the complaint alleges that at a time when Ehrlich was keenly aware that Firm A — to which Voyager had loaned hundreds of millions — was in financial distress, he made misleading representations regarding Voyager's financial and operational condition and the diligence with which it had underwritten Firm A.  Specifically, it alleges that Voyager, spooked by the "collaps[e]" of Luna crytpo currencies to which Firm A was exposed and with "public reports

---

[47]

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

[48]

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation marks omitted).

As Ehrlich notes, "courts look to case law regarding Section 10(b) [of the Securities Exchange Act] and Rule 10b-5 when evaluating claims by the CFTC under Section[ 6](c)(1) and Regulation 180.1(a)."  Dkt 16 (Def. Mem.) at 17 n.8 (citing *Gorman*, 587 F. Supp. 3d at 40); *see Loginovskaya v. Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014).

[49]

*Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

. . . speculating that Firm A may be insolvent," recalled its outstanding loans to Firm A.[50]  At the same time, the complaint alleges, "Voyager initiated a sustained and deliberate campaign to conceal from the public its high-risk exposure to Firm A and its own precarious financial condition."[51]

The complaint proceeds to identify numerous statements made by Ehrlich (directly and through Voyager) that reassured the public and  investors that "[a]ll Voyager products and services [were] fully operational and remain unaffected by current market conditions" and that Voyager had "never engaged in DeFi lending activities and [had] no exposure to stETH."[52]  Each of these statements was misleading, the complaint alleges, because "Voyager was facing operational liquidity issues[,] . . . . in fact was involved in [DeFi lending] activities, and did have significant exposure to stETH, through its relationship with Firm A."[53]  In a July 14 press release, moreover, Voyager assured, "[t]he company is well capitalized and in a good position to weather this market cycle and protect customer assets."[54]  But that same day, Ehrlich acknowledged privately that

---

[50]     Dkt 1 (Compl.) at ¶¶ 83, 90, 92–93.

[51]     *Id*. at ¶ 94.

[52]     *Id*. at ¶ 95; *see id*. at ¶ 107.

[53]     *Id*. at ¶ 96.

[54]     *Id*. at ¶ 97.

Voyager was in dire straits and said that he was "[j]ust trying to keep the business afloat."[55]  In addition, the complaint alleges that Ehrlich's representation that Voyager took a "low-risk approach to lending and asset management" enabled by "extensive due diligence" was false because "Voyager had not vetted its counterparties — including Firm A — through anything approaching an 'extensive' due diligence process."[56]  Indeed, the complaint alleges that Voyager made loans to Firm A without "*any* financial statements (much less audited ones)."[57]

Theses allegations "suffice[] to state a claim based on recklessness" because they "specifically allege[] defendant['s] knowledge of facts or access to information contradicting [his] public statements."[58]  Where, as here, an executive makes "positive predictions" about his company's prospects when he "knew or should have known . . . facts" calling those predictions into doubt, the *scienter* pleading standard is met.[59]  At the least, the complaint alleges that Ehrlich acted

---

[55]

     *Id*. at ¶ 108.

[56]

     *Id*. at ¶¶ 97–98.

[57]

     *Id*. at ¶ 7; *see, e.g.*, *id.* at ¶ 58.

     Having chosen to speak about Voyager's risk management and due diligence processes, Ehrlich had "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002).

[58]

     *Novak*, 216 F.3d at 308; *see Cosmas v. Hassett*, 886 F.2d 8, 10–13 (2d Cir. 1989) (*scienter* requirement satisfied by allegation that defendants made statements that Chinese market would be "important new source of revenue" despite having knowledge of import restrictions that would significantly limit sales to China).

[59]

     *Goldman v. Belden*, 754 F.2d 1059, 1063, 1070 (2d Cir. 1985).

14

with recklessness because his representations that Voyager was solvent and operationally stable was "highly unreasonable" in light of the "danger . . . either known to the defendant or so obvious that the defendant must have been aware of it."[60]

Ehrlich offers three responses to the allegations discussed above.  First, he argues that his statement that Voyager did not face liquidity issues was true because customers still could access their funds.  But this is a factual issue unfit for resolution on a motion to dismiss.  Besides, even assuming the truth of this assertion, it does not follow that *no* liquidity issues existed.  Second, Ehrlich argues that the complaint "makes little effort to argue that Voyager and/or Ehrlich did not hold the belief" "that it took risk management seriously and vetted counterparties through due diligence."[61]  Not so.  As described above, the complaint alleges that Voyager's diligence of Firm A was so anemic as to border on non-existent.  Such allegations constitute strong circumstantial evidence that Ehrlich, who chaired Voyager's Loan Risk Committee,[62] knew that his representations to the contrary at least were misleading.[63]  Last, Ehrlich asserts that "[t]he allegation that

---

[60]

     *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158–59 (2d Cir. 2012) (internal quotation marks omitted); *see Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016).

[61]

     Dkt 22 (Def. Reply) at 11 (internal quotation marks omitted).

[62]

     Dkt 1 (Compl.) at ¶ 7.

[63]

     *See I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 538 (S.D.N.Y. 2017) (conscious misbehavior shown by false representation that due diligence had been performed).

15

counterparties — who had a contractual obligation to repay loans to Voyager — may have had

exposure to stETH does not make Voyager's statement [that it had no exposure to stETH] false or

misleading."[64]  This argument is unpersuasive because a jury reasonably could conclude that

Voyager did in fact have exposure, albeit indirect,[65] to stETH, or that Voyager's statements were

misleading despite being technically accurate.[66]

      The Court holds that the complaint alleges that Ehrlich acted with *scienter* with

respect to Count One.[67]  Accordingly, Ehrlich's motion to dismiss Count One is denied.

## III.   *Whether the Complaint Alleges That Voyager Operated a Commodity Pool*

      Ehrlich contends that Counts Two, Three, and Four should be dismissed because the

complaint fails to allege that Voyager was a commodity pool operator, a premise on which each

count is predicated.  This is unpersuasive.

---

[64]

      Dkt 22 (Def. Reply) at 12.

[65]

      *Cf. Newman v. Fam. Mgmt. Corp.*, 530 F. App'x 21, 25 (2d Cir. 2013) (summary order) (noting that certain investment vehicles created "indirect exposure" to Ponzi scheme); *Municipality of Bremanger v. Citigroup Glob. Markets Inc.*, No. 09-cv-7058, 2013 WL 1294615, at *2 (S.D.N.Y. Mar. 28, 2013), *aff'd sub nom. Mun. Corp. of Bremanger v. Citigroup Glob. Markets Inc.*, 555 F. App'x 85 (2d Cir. 2014) (summary order) (exposure to investment fund may be indirect).

[66]

      *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) ("so-called half-truths" are actionable despite being "literally true" (internal quotation marks omitted)).

[67]

      In a footnote, Ehrlich states that his *scienter* arguments with respect to Count One "establish [a] . . . basis for dismissing Count Two."  Dkt 16 (Def. Mem.) at 19 n.10.  For the reasons explained above, the Court rejects this contention.

*A.      Statutory Definitions*

The Act defines "commodity pool" in relevant part as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests, including any —  (i) commodity for future delivery, security futures product, or swap . . . ."[68]  It defines "commodity pool operator" in relevant part as:

> "any person . . . engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any . . . commodity for future delivery, security futures product, or swap . . . ."[69]

A company may be a CPO notwithstanding the fact that it does not engage in commodity trading itself so long as it "is engaged in a business in the nature of an investment trust, syndicate, or similar form of enterprise, and it solicits, accepts, or receives funds for the purpose of trading."[70]  Thus, an entity is a CPO if, for example, it pools its customers' assets and provides them

---

[68]      7 U.S.C. § 1a(10).

[69]      *Id.* at § 1a(11)(A)(i)(I).

[70]      *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 158 (3d Cir. 2009).

to a third party that then trades commodity interests.[71]  The rationale for this is two-fold.  First, the statutory definition "lacks an explicit trading requirement," and, second, "the remedial purposes of the statute would be thwarted if the operator of a fund could avoid the regulatory scheme simply by investing in another pool rather than trading."[72]

### B.     The Complaint Alleges That Voyager Met the Definition of a CPO

The complaint alleges that Voyager operated a commodity pool.  Specifically, it alleges that Voyager pooled the assets of its customers and used those commingled funds to, among other things, lend to entities that traded commodities.[73]  In exchange, the complaint alleges, Voyager promised to pay customers a set rate of return proportional to the assets they held on the platform.[74]  Voyager funded these "rewards," says the complaint, with interest earned from lending to commodity traders.[75]  Taken together, these averments allege that Voyager was operating a commodity pool.

---

[71]     See CFTC v. Amerman, 645 F. App'x 938, 943 (11th Cir. 2016) (per curiam); Dkt 16 (Def. Mem.) at 14.

[72]     Equity Fin. Grp. LLC, 572 F.3d at 158.

[73]     Dkt 1 (Compl.) at ¶¶ 2, 5, 33, 62, 136–137.

[74]     Id. at ¶¶ 4, 40.

[75]     Id. at ¶¶ 5, 34, 137.

18

Ehrlich contends that the complaint fails to allege that Voyager was possessed of two indispensable characteristics of a CPO.  First, although he acknowledges that an entity may qualify as a CPO by pooling customer funds and lending them to a commodity trader, he argues that the complaint was required to but did not allege that Voyager's loans to CPOs "were made *for the purpose of* trading in commodity interests."[76]  This argument is unpersuasive.  The complaint alleges that Voyager pooled and loaned its customers' assets to Firm A with knowledge that Firm A "planned to use Voyager's transferred assets to engage in spot-futures arbitrage trading."[77]  It alleges, therefore, that Voyager loaned pooled funds for the purpose of commodity trading.[78]  That "Voyager's principal business" may have been "as a brokerage for customers" and Voyager "customers made their own decisions regarding crypto assets" is irrelevant to Voyager's intent in pooling and lending the assets thereby received.[79]  The complaint alleges what Ehrlich himself argues it must, *to wit*, that "the collection, pooling, and investment of the assets . . . [was]

---

[76]     Dkt 16 (Def. Mem.) at 15 (emphasis added ) (internal quotation marks omitted).

[77]     Dkt 1 (Compl.) at ¶ 66.

[78]     *Cf. United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 570 n.22 (1973) (Marshall, *J.*, concurring) ("[A] man is presumed to intend the natural and probable consequences of his acts.").

[79]     Dkt 22 (Def. Reply) at 3 (emphasis omitted).

intentional."[80]

Ehrlich argues next that the complaint fails to allege that Voyager distributed to customers on a *pro rata* basis the proceeds of loans made to CPOs. This argument fails both because there is no *pro rata* requirement and because arguably the complaint does allege *pro rata* distribution.

A CPO need not distribute returns to customers on a *pro rata* basis. Most importantly, there is no such requirement in the relevant statutory definitions. What is more, such a requirement is difficult to square with cases holding that an entity may be a CPO despite promising a fixed rate of return[81] or even operating as a Ponzi scheme that engages in no commodity trading and thus generates no return to distribute, *pro rata* or otherwise.[82] As one district court observed, "[i]t would be odd, indeed, if liability under the [Act] were totally excused any time that funds

---

[80]

    *Id*.

    Also irrelevant is Ehrlich's argument regarding the insignificance of Voyager's loan revenue relative to its fee revenue. In any case, this argument is predicated upon materials not properly before the Court. Similarly, the Court does not consider CFTC Commissioner Caroline D. Pham's statement. Ehrlich's claim that he does not quote this statement for its truth, Dkt 22 (Def. Reply) at 7, is not credible in light of the use to which he put the statement in his opening brief. *See* Dkt 16 (Def. Mem.) at 14.

[81]

    *See CFTC v. Brockbank*, No. 00-cv-622, 2006 WL 223835, at *2–3 (D. Utah Jan. 30, 2006) (entity was CPO despite fixed rather than *pro rata* return); *CFTC v. M25 Invs., Inc.*, No. 3-09-cv-1831, 2010 WL 4269124, at *7 (N.D. Tex. Oct. 25, 2010) (consent order) (entity that promised fixed interest rate was CPO); *CFTC v. Oasis Int'l Grp., Ltd.*, No. 8:19-cv-886, 2023 WL 8452004, at *2, *11 (M.D. Fla. Dec. 6, 2023) (same).

[82]

    *See CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106, 1108  (C.D. Cal. 2003); *Brockbank*, 2006 WL 223835, at *3.

invested for the purpose of investing in commodity pools were 100% successfully diverted away from actual trades instead of only a lesser percentage of the total investor funds being so diverted."[83] The contrary case law on which Ehrlich relies is neither binding nor persuasive.  Indeed, *Lopez v. Dean Witter Reynolds, Inc.*, the primary case cited by Ehrlich, states but does not attempt to justify the *pro rata* requirement.[84]  On the other hand, courts that have considered critically the wisdom of such a requirement have rejected it.[85]  The Court holds that the Act does not require that an entity distribute investment returns on a *pro rata* basis to qualify as a CPO.

In the alternative, it is at least arguable that the complaint alleges that Voyager distributed the returns on the CPO loans *pro rata* to its customers.  *Pro rata* means "proportionateley according to some exactly calculable factor"[86] such as "an exact rate, measure, or interest."[87]  As the CFTC explains, Voyager customers' "right to a share of the common fund depended only on the

---

[83]

    *Brockbank*, 2006 WL 223835, at *3.

[84]

    805 F.2d 880, 884 (9th Cir. 1986).  In any case, the facts of *Lopez* are readily distinguishable from the facts of this case substantially for the reasons explained by the CFTC.  *See* Dkt 21 (Pl. Mem.) at 42–43; *see also Brockbank*, 2006 WL 223835, at *3 ("[T]he finding in *Lopez* turned on the fact that the plaintiff's investment was treated individually, rather than [as] part of a common pool when it was traded.").

[85]

    *See, e.g.*, *CFTC v. Vision Cap. Corp.*, No. 04-cv-0804, 2007 WL 4246302, at *4 (D. Utah Nov. 28, 2007); *Brockbank*, 2006 WL 223835, at *3.

[86]

    *Pro Rata*, Webster's Third New International Dictionary (1963).

[87]

    *Pro Rata*, Black's Law Dictionary (12th ed. 2024).

amount of the customer's deposit and the promised interest or reward rate, which varied by asset, month, and the customer's asset holdings."[88]  These proportional distributions were funded partially by loans to commodity traders, including Firm A.[89]  In other words, Voyager promised to pay its customers in proportion to the assets they agreed to commingle in a pool destined for commodity trading.

*Conclusion*

For the foregoing reasons, Ehrlich's motion to dismiss (Dkt 15) is denied.

SO ORDERED.

Dated:        August 29, 2024

                                                      _____
                                                              Lewis A. Kaplan
                                                        United States District Judge

---

[88]     Dkt 21 (Pl. Mem.) at 44 n.12; Dkt 1 (Compl.) at ¶¶ 4, 34.

[89]     Dkt 1 (Compl.) at ¶¶ 34, 40, 50, 56, 62, 137.

Ehrlich asserts that the CFTC seeks "to 'marry up' the Rewards Program to the third-party loans" without a basis in fact.  Dkt 16 (Def. Mem.) at 15.  The alleged relationship is not baseless.  For example, the complaint quotes a Voyager executive as stating that in order for Voyager to continue paying customers four percent interest on Bitcoins held on its platform it would "have to . . . lend to riskier borrowers."  Dkt 1 (Compl.) at ¶ 56.